STATE OF WEST VIRGINIA

*v.*

GEORGE WOOLDRIDGE, *et al.*

(No. 9819)

Submitted October 1, 1946. Decided December 21, 1946.

450

 

*Robert J. Riley, James A. Byrum,* and *M. E. Boiarsky,* for plaintiffs in error.

*Ira J. Partlow,* Attorney General, *Ralph M. Hiner,* Assistant Attorney General and *Eston B. Stephenson,* Special Assistant Attorney General, for defendant in error.

FOX, JUDGE:

The defendants, George Wooldridge, Alexander Bowie, Ben Kaminsky, Stanley S. Socha, Jack Givens, Harry Givens, Joseph Stafford, Laddie Birkhimer, Walter Pfiller, Harvey Hall, Daniel Badis, Steve Bartek, Anthony Getsinger, Jr., John Cencarik and Lemar Cook, were jointly indicted by a grand jury of Hancock County on April 11, 1944. The indictment was based on the provisions of Code, 61-6-1, which reads:

> "All judges and justices may suppress riots, routs and unlawful assemblages within their jurisdiction. And it shall be the duty of each of them to go among, or as near as may be with safety, to persons riotously, tumultuously, or unlawfully assembled, and in the name of the law command them to disperse; and if they shall not thereupon immediately and peaceably disperse, such judge or justice giving the command, and any other present, shall command the assistance of all persons present, and of the sheriff of the county, with his posse if need be, in arresting and securing those so assembled. If any person present, on being required to give his assistance, depart, or fail to obey, he shall be deemed a rioter."

The penalty prescribed for riots, routs and unlawful assemblages is prescribed in Code, 61-6-6, which reads as follows:

"If any person engaged in a riot, rout or unlawful assemblage, pull down or destroy, in whole or in part, any dwelling house, courthouse, jail, prison, asylum, hospital, school or college building, or any public building of any character, or assist therein, he shall be guilty of a felony and, upon conviction, shall be confined in the penitentiary not less than one nor more than ten years; and though no such building be injured, every rioter, and every person unlawfully or tumultuously assembled, shall be guilty of a misdemeanor, and, upon conviction, shall be confined in jail not more than one year and fined not exceeding five hundred dollars."

Omitting the names of the defendants, other than George Wooldridge, the indictment returned by the grand jury is in the language following: "The Grand Jurors of the State of West Virginia, in and for the body of the county of Hancock, upon their oaths present that, on the 30th day of March, 1944, in the said county of Hancock, George Wooldridge, * * * did unlawfully assemble together to disturb the peace, and, being so unlawfully assembled, did then and there unlawfully make a great noise, tumult and disturbance, and did then and there unlawfully remain assembled together and continue to make a great noise, tumult and disturbance, for a long space of time, to the great disturbance of other persons then and there lawfully being and passing along; and that the said George Wooldridge, * * * being then and there unlawfully assembled and unlawfully making a great noise, tumult and disturbance, were then and there lawfully commanded by Norman D. Ferrari, a Justice of the Peace for said county of Hancock, to immediately and peaceably disperse; but that the said George Woolridge * * * after having been so lawfully commanded to immediately and peaceably disperse, unlawfully and wilfully failed and refused to do so against the peace and dignity of the State."

There was no attack on the indictment, and on the day it was returned defendants appeared in open court, waived arraignment, and entered their plea of not guilty. On their motion further proceedings on the indictment were continued to April 24, 1944, on which day the defendants filed their petition for a change of venue, the hearing on which was continued to September 12, 1944, and from that date to September 15, following, when said motion was renewed. On December 2, 1944, the State filed its demurrer to the petition filed by the defendants with their motion for a change of venue, which demurrer was on that day sustained and said petition dismissed. It appears that on April 24, September 15, October 2, and December 2, and perhaps on other dates in the year 1944, proceedings were had on the motion and petition for a change of venue, including arguments on the demurrer aforesaid, affidavits, exhibits, consisting of newspaper clippings and other documents, all made a part of the record. The trial judge filed a memorandum opinion on this question, made a part of the record, on dates which do not always correspond with the dates when orders were entered carrying such opinions into effect.

The trial began on January 24, 1945, and the motion for a change of venue was renewed on that date, and again overruled. A jury was impanelled, in the process of which there was a prolonged controversy as to the propriety of permitting certain persons to qualify as jurors. The trial continued for several days, with the usual contentions as to the admission and refusal to admit as evidence certain testimony offered. At the end of the taking of testimony, there was a motion by the defendants, in chambers, for a mistrial, based on the various contentions made by the defendants before and during the trial, and which the trial judge had denied, which motion was overruled. There was also a motion by defendants for a directed verdict in their favor, which was likewise overruled. The defendants then offered various instructions, which will be dealt with

in detail later in this opinion, all of which were refused, and in lieu thereof the trial judge gave a general charge. On February 1, 1945, the jury returned a verdict of guilty as charged in the indictment, as to all of the defendants. Immediately the defendants made a motion to set aside the verdict and for a new trial, and also a motion in arrest of judgment. On February 27, 1945, the trial judge filed a written opinion, made a part of the record, overruling these motions, which ruling was made effective by order entered in the case on April 11, 1945, and judgment on the verdict aforesaid was entered, and sentence imposed on the defendants on that day. The defendants, Daniel Vadis, Steve Bartek, Anthony Getsinger, Jr., John Cercarik, and LeMar Cook were each sentenced to confinement in the county jail of Hancock County for a period of sixty days, and to pay a fine of one hundred dollars; and the other ten defendants were each sentenced to confinement in the same jail for a period of thirty days, and to pay a fine of fifty dollars. All of the defendants were assessed with the costs of the prosecution. The reason for the disparity in the sentences will later appear.

It should be stated at this point that at all stages of the trial, and in the preliminary motions and proceedings leading thereto, the defendants, individually and collectively, had saved to them by their counsel, the benefit of all alleged errors of the trial court, through objections, specific where necessary, and by exceptions duly and properly taken at the time.

On January 22, 1946, on the joint petition of the defendants, we granted this writ of error and supersedeas to the judgment aforesaid.

Before considering this case on its merits, a preliminary question relating to the bills of exceptions demands our attention. The question is a vital one, for only if we hold that the bills of exceptions were legally signed by the trial judge, can we consider the evidence on which the defendants rely.

On April 11, 1945, when the ·final judgment was entered and sentences imposed on the defendants, the record shows that the following colloquy between the court and counsel occurred, which was taken down by the court reporter at the time: ·

"Mr. Riley: We would like to give notice that we intend to make application for writ of error and supersedeas and would like a stay to prepare the record. Will that stay be ninety days?

"The Court: I suppose you will need at least ninety days for that, Mr. Riley, considering the length of this record.

"Mr. Moore: I certainly have no objection to ninety days.

"The Court: And considering the engagements of the court and its reporter for the next ninety days, I think you will need every bit of ninety days, but of course, you can easily have an extension, if that should be necessary.

"Mr. Riley: Ninety days from today?

"The Court: Yes. That is enough under normal conditions but if you need more, you can have it, of course. Naturally, we don't wish to throw any stone ·in the way of every proper appeal you may have. Is there anything further, gentlemen?

"That is all."

The order entered on April 11, 1945, contains this language and nothing more, pertaining to a stay to permit defendants to apply for a writ of error:

"* * * and thereupon each of the defendants gave notice of his intention to apply to the Supreme Court of Appeals of West Virginia for a writ of error and supersedeas to said judgment and · sentences, and moved the Court to stay execution of his sentence for ninety days from this day, pending his application, and said motions were sustained. ·

"Accordingly, it is ordered that execution of the sentence imposed on the defendants be and it is hereby stayed for ninety days· from this day, · pending application to the Supreme Court of Ap-

peals of West Virginia for a writ of error and supersedeas to said judgment and sentences, and that the defendants be released from custody for ninety days from this day, on giving bond in the amount of five hundred dollars each, with good security, conditioned according to law."

It will be noted that the stay mentioned in the above order was ninety days from April 11, 1945. Aside from this order, the defendants, under Code, 56-6-35, were entitled to have proper bills of exceptions signed by the trial judge, if presented to him within sixty days from the adjournment of the term at which their trial was had, which adjournment, the record shows, occurred on April 27, 1945. Therefore, the sixty-day period provided for by statute expired on June 26, 1945.

On June 27, 1945, as appears by an order entered on the following day, the defendants appeared and asked a sixty-day extension of time in which to prepare bills of exceptions, which motion the court granted, using the following language:

"said motion is accordingly granted and said defendants are granted an additional period of sixty (60) days from the expiration of the original period· of ninety days heretofore given within which to have prepared and present their bills of exceptions herein to the court for signature and certification and to apply the Supreme Court of Appeals of West Virginia for a writ of error and supersedeas to the judgment and sentences herein."

On August 27, 1945, defendants were granted an additional sixty days in which to prepare their bills of exceptions.

On October 23, 1945, defendants moved the trial court, in vacation, to amend its order of April 11, 1945, which is copied into the order which the court entered on said motion, so as to make the same speak the judgment of the court in its entirety, as actually pronounced on the date said order was entered. The trial court filed a memorandum decision on the matters raised by the

motion; and on October 23, 1945, entered an order which concludes as follows:

"Accordingly, without further ruling than indicated in said memorandum, it is hereby ordered that said defendants, and each of them, be, and they are hereby granted a period of ninety days from the 11th day of April, 1945, in which to have prepared and to present their bills of exceptions herein to the court for signature and certification and to apply to the Supreme Court of Appeals of West Virginia for a writ of error and supersedeas to the judgments and sentences herein.

"It is further ordered that said order of April 11, 1945, be amended and *correct* so as to include this order, and it is now ordered that the same be entered now for then."

Thus we have raised two questions: (1) The effect and true meaning of the order of April 11, 1945; and (2) the validity of the *nunc pro tunc* order of October 23, 1945.

If we disregard the colloquy between the court and counsel at and before the order of April 11, 1945, was entered, taken down by the court reporter at the time, and set out in the court's memorandum of October 23, 1945; consider only the language contained in said order; and place a strict construction thereon; the trial judge did not give to the defendants any time in which to prepare bills of exceptions, leaving to them only the right granted by Code, 56-6-35. The order says nothing about bills of exceptions, but refers only to "stay of execution of his sentence". The defendants made clear to the trial judge at the time, their intention to apply to this Court for a writ of error and supersedeas, and for that reason sought an extension of the judgment and sentence; but the court, inadvertently we think, confined his order to a stay of execution of sentence. Construing the order strictly, we can give it no other meaning.

But this does not settle the matter. When we refer to the colloquy mentioned above, we find that counsel

·for defendants stated to the trial court their intention to make application for a writ of error and supersedeas, and that they "would like a stay to prepare the record. Will that stay be ninety days?" The Court said: "I suppose you will need at least ninety days for that Mr. Riley, considering the length of this record." The prosecuting attorney, being present, stated that he had no objection to the proposed ninety days. The court then referred to the court reporter's engagements over the ninety-day period under discussion, and spoke of possible extensions of time should they be necessary. Then followed the agreement that the ninety days should run from the date on which the colloquy occurred, to-wit, April 11, 1945. All this clearly indicates, that what all parties had in mind, was the time necessary to prepare the record, and that the aid of the court reporter in that connection would be necessary. Aside from the evidence, the circuit clerk could have prepared the record. Clearly, what the parties had in mind was the time necessary to transcribe the evidence, so that it could be incorporated in bills of exceptions. That this is true is attested by the language used in the order of June 27, 1945, one day after the expiration of the sixty days from the adjournment of the term of court at which defendants were tried, but within the ninety-day period from April 11, 1945, on which date the court entered final judgment.

The legality of this extension and a later one, August 27, 1945, do not seem to have been questioned at the time of entry. For some reason, however, defendants, on October 23, 1945, asked the trial court to correct the order of April 11, 1945, in the particulars heretofore stated. This the court did as set out above.

It is fundamental that this Court will not consider evidence not made a part of the record in one of the two methods prescribed by Code, 56-6-35, 36. This being true, properly executed bills of exceptions, or in lieu thereof a certificate, are necessary to give this Court jurisdiction to hear matters which must be made a

part of the record by bills of exceptions or certificate. But the preparation of bills of exceptions or a certificate, and their execution by the trial judge, is procedural, to which a liberal rule should be applied, to the end that a person shall not be deprived of his full day in court, through some unintentional mishap, or some careless act, not going to the merits of the case. A strict rule might be justified in civil cases, where money judgments are usually involved, but not so in a criminal case, where the State is involved. The State must be considered as being willing, even anxious, to accord to one of its citizens the right to test the legality of his conviction, in any court having jurisdiction to pass upon the same, without applying too strict a rule as to purely procedural matters.

Applying these principles, we are of the opinion that the bills of exceptions in this case were legally and properly signed, and served to make a part of the record the matters and things contained therein. We base our conclusion on two grounds: (1) The proper interpretation of the order of April 11, 1945, when read in connection with the colloquy which immediately preceded its entry, and the trial judge's order of June 27, 1945; and (2) the entry of the *nunc pro tunc* order of October 23, 1945. We think the entry of that order was proper. We do not mean to depart from the general rule announced in *Monongahela Railway Co.* v. *Wilson,* 122 W. Va. 467, 10 S. E. 2d 795, following *Cameron* v. *Cameron,* 105 W. Va. 621, 143 S. E. 349; *Dwight* v. *Hazlett,* 107 W. Va. 192, 147 S. E. 877; *Stannard Supply Co.* v. *Delmar,* 110 W. Va. 560, 158 S. E. 907; and *State* v. *Thornhill,* 111 W. Va. 258, 161 S. E. 431. But we think that the record made by the court reporter clearly shows that what the court and counsel had in mind at the time, and the legal effect of what the trial court did, was to give to defendants ample time to prepare a record for presentation to this Court on application for a writ of error and supersedeas, which preparation involved the aid of the court reporter, and could

as to him involve only the evidence. There is no particular sanctity attached to the form of the entry or memorandum required as the basis for a *nunc pro tunc* order. A direction given to the court reporter, an officer of the court, which he preserves in the same manner he applies to evidence or other proceedings in the case, should be held to serve as a memorandum on which a *nunc pro tunc* order can be based. What the trial judge said on April 11, 1945, clearly convinces us that his words uttered on that occasion should be construed as a direction to give the defendants ninety days in which to prepare the record, including bills of exceptions incorporating the evidence. For these reasons we hold that the entry of the *nunc pro tunc* order aforesaid was fully warranted.

At this point, and before entering upon a discussion of the assignments of error growing out of the trial, we think it advisable to make certain general observations, which we trust will serve to explain the meaning of some of our holdings in this case. While we recognize the importance of this case to defendants who, under the judgment of the trial court, will be deprived of their liberty, and subjected to what may be for them substantial fines, we think counsel for the State and for the defendants, with outside influences contributing, have sought to try an industrial and labor dispute, which has no proper place in a plain and simple case, where the provisions of the statute law of this State are alleged to have been violated. The alleged violations of law, and the measures taken to curb them, were, in our opinion, planned and staged from the beginning. Newspapers were notified, photographers assembled, proclamations prepared for use and printed, and altogether preparations were made for a field day on which giants would do battle in an industrial dispute, and be assured that due publicity would follow. In these circumstances, the actors were expected to do their parts, and in that way publicize the dispute throughout the State and Nation. This was altogether improper. The State of West Virginia was not concerned in the dispute or con-

troversy between a great industrial organization, carrying on its business in this State, and labor organizations seeking the right to organize and speak for its employees; nor in any dispute between different organizations or groups, seeking advantages in connection with the right to speak for such employees in matters concerning collective bargaining; so long as such dispute was conducted in an orderly manner, and no law violated. If a law should be violated, any prosecution therefor should be initiated and conducted without regard to the merits of the private dispute out of which such violation originated.

The defendants, having first made their plea of not guilty, their next important step was to move for a change of venue, a motion for which was made and renewed from time to time, and again made on the day the trial began. These motions engaged the attention of the trial judge for at least eight months, and we think were properly overruled. Article III Section 14 of the Constitution of this State, contemplates and provides for a change of venue in a criminal case upon the petition of an accused; and Code, 62-3-13, provides: "A court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county." But in *State* v. *Beale,* 104 W. Va. 617, 141 S. E. 7, 141 S. E. 401, it was held: "An application for change of venue in a criminal case is addressed to the sound discretion of the trial judge, and the burden is upon the prisoner to show good cause for the change. Such good cause must be shown to exist at the time the application is made. Facts and circumstances must be shown satisfying the court that a fair trial cannot be had." See also *State* v. *Sheppard,* 49 W. Va. 582, 39 S. E. 676; *State* v. *Powers,* 91 W. Va. 737, 113 S. E. 912; *State* v. *Wisman,* 94 W. Va. 224, 118 S. E. 139; *Proudfoot v. Pocahontas Transportation Co.,* 100 W. Va. 733, 132 S. E. 746; *State* v. *Lucas,* 103 W. Va. 743, 138 S. E. 393; *State* v. *Wainwright,* 119 W. Va. 34, 192 S. E. 121. There

appears to be no dispute as to the law governing this subject. The only question here involved is whether the trial judge abused the sound discretion vested in him. There is a mass of affidavits, newspaper clippings, news items and editorials in the record, all tending to show the extent of the bitterness of the controversy being waged at the time of the offense alleged, for the prized privilege of representing the employees of Weirton Steel Company, in matters pertaining to collective bargaining, and to show that such conditions continued to the time of the trial. A local union and a branch of a nation-wide labor organization are said to have been involved in a bitter dispute at the time of the alleged commission of the offense with which the defendants are charged. The fact of this unhappy situation may be admitted; but it is not shown that all the citizens of Hancock County were involved in these disputes, or held any prejudice for or against those who were involved therein. It may well be doubted whether the citizenship of any county of this State is entirely free from prejudice generated by labor disputes. Everywhere would be found prospective jurors who would be found disqualified to serve in the trial of a case where a labor dispute was involved; but everywhere, including Hancock County, a sufficient number of qualified and unprejudiced jurors could no doubt be found to try any character of case. If this be true, what prejudice results to a defendant when his motion for a change of venue is denied? Furthermore, there was no showing of prejudice against the individual defendants, or any one of them. Whatever feeling did exist for or against the two unions involved, is not shown to have extended to individual partisans of either. As indicated above, the turmoil with which Hancock County was cursed, growing out of the conflicting interests of men and groups, had no proper place in the trial of the case at bar, and where a trial court, in the exercise of its sound discretion, holds that defendants charged with an offense can obtain a fair trial in the county where the alleged offense was committed, and where the defendants are, under our Constitution,

entitled to be tried, this Court will be slow to reverse its ruling, and will do so only where it can be seen, from the facts and circumstances, that the trial court was plainly wrong. In this case we cannot see that the trial judge was in error; but, on the other hand, we think he made a correct ruling on the question of venue.

Proceeding with the trial, the next question raised grows out of the selection of the jury. Defendants complain of the refusal of the trial court to permit questioning of jurors along lines involving the steel company, and the dispute between the contending unions. We see no error in the court's ruling on these questions.

The principal error assigned in connection with the selection of the jury grows out of the fact that of the twenty jurors qualified by the court to sit in the case, and subject to peremptory challenge as to eight thereof, three were at the time employees of the Weirton Steel Company. Only one of them, not a member of any union, sat on the jury which tried the case; but, of course, the contention of the defendants is that these three jurors should have been subject to challenge for cause, and that they should not have been required to use their peremptory challenges as to any one of them. The trial judge dealt with this question at length, in his ruling on the motion of defendants for a new trial and in arrest of judgment. As there pointed out, the Weirton Steel Company had no real interest in the dispute between the competing labor unions, although it might be conjectured that it sympathized with what may be termed the local union. The three employees of the steel company were subjected to a rigid examination on their *voir dire,* and passed the test of competency and fairness imposed by the trial court. They stated on their oaths that they had no interest in the case, and that they could give the defendants a fair trial. This is all the defendants had a right to demand of any juror. Moreover, the record shows that more than ten thousand men worked for the steel company in Hancock County, and that there is a division among them as to

their attitude towards the competing labor unions; wherefore, the mere fact that a man was an employee of the steel company was no evidence that his sympathies were with or his prejudices against the union to which defendants belonged. But the sound principle underlying the trial court's ruling on the question is this: A juror, otherwise qualified, should not be subject to challenge for cause, merely because he is an employee of a person, firm or corporation, not a party litigant, or interested in the result of the litigation, but from the operation of whose business a controversy between and among others has arisen. This proposition is sustained by authority: "All authorities agree that if a juror offered is related to the party, occupies the relation of master, servant, etc., he may be challenged for cause". *State* v. *Dushman*, 79 W. Va. 747, 91 S. E. 809. Code, 56-6-12. But the inhibition goes no farther. See *State* v. *Stafford*, 89 W. Va. 301, 109 S. E. 326; *State* v. *Lohm*, 97 W. Va. 652, 125 S. E. 758; *State* v. *McMillion*, 104 W. Va. 1, 138 S. E. 732; *State* v. *Stonestreet*, 112 W. Va. 668, 166 S. E. 378. On the whole we are of the opinion that no error was committed in the selection of the jury.

The offense charged against the defendants in the indictment was committed on the 30th day of March, 1944. On the day following the Governor of the State of West Virginia issued a proclamation which, among other things, contained this language: "Whereas it appears that various persons are being unlawfully deprived of their liberty and their constitutional right peaceably to assemble and that there is imminent danger of recurrence of breaches of the peace and resistance to the law within that part of Hancock County hereinafter designated: * * *." The proclamation then proceeds to direct the Department of Public Safety to enforce law and preserve order within certain described territory in Hancock County, understood to include the plant of the Weirton Steel Company and adjacent territory. This proclamation, together with testimony tending to show the effect thereof, was offered in evi-

dence by the defendants, and the trial judge refused to admit the same. This ruling was plainly right. The issuance of the proclamation in question, and every result which followed therefrom, occurred after the commission of the alleged offenses with which the defendants are charged. We are at a loss to see how such a showing could have any proper bearing upon the guilt or innocence of the accused.

As indicated above, advance notice was given that an attempt would be made to distribute literature at the steel company's gate on March 30, 1944, and photographers were present on the afternoon of that day. The pictures taken by them were offered in evidence by defendants, presumably to show that the number of persons present at and around the entrance gate, did not indicate that there was any assemblage or disorder requiring a proclamation to disperse, and for such other purposes as might be material to show the true situation at that time and place. Certain of these photographs thus offered were admitted in evidence and others were refused admission.

The propriety of the use of photographs to show factual situations is well established by our decisions and by general authority. *Merrill* v. *Torpedo Co.*, 79 W. Va. 669, 92 S. E. 112; *Coleman* v. *Railway Co.*, 100 W. Va. 679, 131 S. E. 563; *State* v. *Goins*, 120 W. Va. 605, 199 S. E. 873; 4 Jones Commentaries on Evidence, 2d Ed., 3214; 3 Wigmore on Evidence, 3rd Ed., 178. But, as stated in the *Goins* case, "* * * the trial judge is invested with a very broad discretion in passing upon their relevancy", and they should not be treated as truly relevant where there is doubt as to whether they depict a given situation in its true light. It is known that photographs can be so taken as to misrepresent an object or a situation. Wigmore seems to hold that this only bears on the weight to which any photograph may be entitled; but we think that a photograph which fails to show the picture of an entire scene, and which merely shows a part of it, tends to mislead and confuse, rather than

enlighten, a jury. Here the photographs refused as testimony were taken from different positions, at different angles, and none of them purports to cover the entire scene. The refusal of the trial court to admit this type of photographs in evidence was not an abuse of its discretion, and was not error.

After the taking of evidence had been completed, the defendants moved the trial court for a mistrial, based on the fact that "the court allowed on the panel parties employed by the Weirton Steel Company, two of whom we were required to use strikes, and that there is at present sitting on the jury John Bender, a clerk in the general office of the Weirton Steel Company. We file with and in support of said motion for mistrial the Weirton Worker issued January twenty-fifth, during this trial, and refer also to the affidavits contained in the motion for a change of venue." This motion was, in our opinion, properly denied. Our reason for this ruling will appear from this opinion as written to this point. A motion was then made to strike out the evidence and direct a verdict for each of the defendants, and was overruled. This motion will be discussed later on in this opinion.

We next come to the instructions. So far as the record discloses, the State offered no instructions. The defendants offered two groups of instructions: the first group is designated as instructions A, B, C, D, E, F, and G, and the second group is numbered from 1 to 29. The trial judge refused all instructions offered, and gave a general charge. In view of this general charge, the defendants withdrew instructions Nos. 17 to 28, both inclusive, leaving only the first group and instructions Nos. 1 to 16, and instruction No. 29 to be considered. We will consider all these instructions in their relation to the general charge given as aforesaid.

The first group of instructions was confined (1) to the right of defendants to disseminate information concerning their union and to solicit membership therein, on public property, at or near the gate of an industrial

plant, when carried on in an orderly manner; (2) the same right even if disorder is created by other parties in an effort to prevent such dissemination of information; (3) the right of members of a labor organization, under the constitutional guaranty of freedom of speech, to appeal for public support by making known the facts in a labor dispute, when done in an orderly and peaceable manner; (4) that the constitutional guaranty of free speech includes the right to distribute information concerning labor organizations on public property, and cannot be restricted by local law enforcement officials, except to prevent grave and immediate danger to the health and safety of the public; (5) that the free communication of views with reference to labor organizations and other matters cannot be suppressed or denied under the guise of conserving desirable conditions in a community, unless there is a clear and present danger of riot, disorder, or other immediate threat to public safety, peace or order; (6) the right of the members of a labor organization to solicit membership and appeal for support by advertising on, or patrolling in, any public street, so long as there is no resort to a breach of the peace, violence or threat thereof; and (7) that members of a labor organization may not lawfully be prevented from distributing pamphlets and soliciting membership on a public street, near the entrance to a mill or plant, merely because such acts may provoke violence on the part of others.

Aside from their redundancy, we see nothing to condemn in any one of these instructions, and, but for the general charge, it would have been error to refuse to give them, or the substance thereof, to the jury. But the trial judge in his general charge told the jury: "We may here begin by saying that no one contends that the distribution of literature is unlawful. In other words, defendants had a right to make such distribution at the mill gate. They are required simply to do it lawfully." At another point in his general charge, he said: "There is no question that these several people referred

to in the evidence, including the defendants, had a legal right to be where they were at the time of this alleged assembly. The members of the United Steel Workers of America had and have a legal right to attempt to increase their membership by solicitation of new members on public premises, including those near the mill gate referred to in the evidence, where employees of the Company are accustomed to pass. All that is required of members of this union is that they proceed in an orderly and proper manner." It is true that the instructions offered contain references to "dissemination of information", "solicitation of membership", "freedom of speech"; and reference is made to possible disorders, not shown by the evidence to exist in this case. We think all these matters are covered by the general charge. What the defendants were doing at the mill gate was primarily the distribution of literature, although there may have been some rather untactful solicitation of members. When the jury was told that the defendants had a right to distribute literature and solicit membership, at the mill gate, every practical element of the right of freedom of speech, including the right to disseminate information, was protected. We hold that in view of the general charge to the jury, there was no error in refusing to give to the jury the seven instructions, constituting the first group, discussed above.

Instruction No. 29, offered by the defendants, is divided into five paragraphs. The first, second and third paragraphs do nothing more than tell the jury, in effect, that the State must prove beyond a reasonable doubt that defendants did assemble together to disturb the peace, and did unlawfully make a great noise, tumult and disturbance; and that they were lawfully commanded to disperse and failed to do so. The fourth and fifth paragraphs would have told the jury that no one of the defendants could be convicted unless orally commanded to disperse by the justice of the peace, and failed to do so; that the justice could not delegate to another his power to make the command to disperse, which, it is

alleged, the defendants refused to obey. In our opinion, the first, second and third paragraphs of this instruction are covered by the general charge. The fourth and fifth should not have been given. The one proclamation and command to disperse was sufficient. It is clear that all the defendants were acting in carrying out a preconceived plan of action, and notice to one group was notice to all. This does not mean that there was a conspiracy between the defendants, and none is charged. What they did was nothing more than planned cooperation and that, it is contended, was a lawful undertaking. Clearly each of the defendants knew of the command to disperse made by the justice of the peace. Furthermore, both the State and the defendants minimize the importance of the failure to disperse, and hold the gravamen of the offense to be the alleged unlawful assemblage. In our opinion, there was no error in the refusal of the trial court to give instruction No. 29.

Instruction No. 1, offered by the defendants and refused, reads as follows: "The Court instructs the jury that they should find the defendants not guilty." Instructions Nos. 2 to 16, inclusive, used the identical language employed in instruction No. 1, except that in lieu of the words "the defendants", the name of a different but single defendant was used in each of the fifteen instructions, amounting to a direction to find a verdict of not guilty as to each individual defendant. Each of these instructions was refused by the trial court. Of course, the court's action on these sixteen instructions, considered in connection with the motion to strike out the evidence and direct a verdict for the defendants, made when the taking of testimony in the case had been completed, presents the remaining and decisive question raised on the record before us. That question is: Was the verdict returned by the jury, guided by the general charge aforesaid, justified by the evidence?

In answering this question, it is necessary to consider first the general charge given by the trial judge to the jury. The specific objections of the defendants

to that charge, took the form of a complaint that the first group of instructions was not given; for example, that the charge failed to include any reference to the constitutional right of free speech and other matters therein contained bearing on the right to disseminate information. We have already stated that we think the general charge covered these rights.

The general charge properly instructed the jury: (1) That the defendants were presumed to be innocent of the charge made in the indictment; (2) that their guilt must be established beyond a reasonable doubt; (3) that the jury should disregard all questions of difference between the labor unions involved, and the matter under inquiry; (4) that all of the defendants who had notice of the command to disperse were subject to the provisions of the statute on which the indictment was found; and (5) what constituted unlawful conduct. The most important paragraphs of the instruction reads as follows:

"The gist of the offense charged is unlawful assembly. To constitute this offense there must be a gathering of three or more persons, with a common intent, formed before or at any time during the meeting, to attain a purpose, lawful or unlawful, by committing disorderly acts in such a manner as to cause sane, firm and courageous persons in the neighborhood to apprehend a breach of the peace. In other words, we must have first a common purpose. This purpose may be lawful or unlawful, Second, there must be, sometime before or during the assembly, an unlawful act committed with common intent. This intent may be formed before the meeting, at the meeting or after the meeting has begun. This intent may exist for a month or for a minute — time is not important. There must be the commission of such unlawful act, either by all present or by one or more with the agreement and consent of the others. Of course, when we say "by all present" we mean all concerned in the common purpose — not bystanders. Third, the unlawful act so committed must be of such a nature as to cause firm, sane and courageous persons in the neighborhood to apprehend a breach of the peace.

"Refusal to disperse when lawfully commanded
is a circumstance, if found to exist by a jury, to be
considered in evidence, but is not itself the crime
for which these defendants are indicted."

We are of opinion that there was no error in the general charge.

A reading of Sections 1 and 6 of Article 6, Chapter
61 of the Code, and the indictment on which defendants
were tried, convinces us that the offense charged and
for which punishment could be inflicted is that of engaging in a riot, rout, or unlawful assemblage. Under
those statutes, properly construed, a person who engages
in either of those offenses could be indicted and punished, even though, upon command to disperse, he had
obeyed the command. Therefore, the court properly
instructed the jury that the gravamen of the alleged
offense in this case was unlawful assemblage, there being no evidence of either a riot or a rout.

Measures to prevent and suppress riots, routs and
unlawful assemblages were not unknown to the common law. They are discussed in 4 Blackstone, pages
143 to 146, and the offenses are there defined as follows:
"An unlawful assembly is when three or more do assemble themselves together to do an unlawful act, as
to pull down enclosures, to destroy a warren or the game
therein; and part without doing it, or making any motion towards it. * * * A rout is where three or more
meet to do an unlawful act upon a common quarrel, as
forcibly breaking down fences upon a right claimed of
common or of way; and make some advances towards
it. A riot is where three or more actually do an unlawful act of violence, either with or without a common
cause or quarrel: as if they beat a man; or hunt and
kill game in another's park, chase, warren, or liberty;
or do any other unlawful act with force and violence;
or even do a lawful act, as removing a nuisance, in a
violent and tumultuous manner." In Black's Law
Dictionary, Third Ed., 1784, under the head of "Unlawful Assembly", it is stated: "At common law. The

meeting together of three or more persons, to the disturbance of the public peace, with the intention of cooperating in the forcible and violent execution of some unlawful private enterprise. If they take steps towards the performance of their purpose, it becomes a rout; and, if they put their design into actual execution it is a riot. 4 Bl. Comm. 146. Any meeting of great numbers of people, with such circumstances of terror as cannot but endanger the public peace, and raise fears and jealousies among the subjects of the realm. 4 Steph. Comm. 254; * * *." By Chapter VII of the Acts of the Virginia Assembly 1847-8, a statute was enacted on this subject, which was carried into the Virginia Codes of 1849 and 1860, and into our Code of 1868. It now appears in Article 16 of Chapter 61 of the Code, with only slight change, which is not material, from its original form as it appeared in the 1849 Code. Until the case at bar reached this Court, no case involving the construction of this statute had been presented to the Supreme Court of Appeals of Virginia or of this State. Therefore, the question of how the provisions of Code, 61-6-1, 6, should be construed and applied to the facts of this case, is one of first impression in this State. The trial judge instructed the jury that "The gist of the offense charged is unlawful assembly." It will be noted that Code, 61-6-1, 6, do not attempt to define "riots, routs and unlawful assemblages", and Blackstone's definitions of these offenses become useful. No one contends that there was a riot or a rout at the mill gate on March 30, 1944, but it is contended that there was an unlawful assemblage, which, according to Blackstone, is where "three or more do assemble themselves together to do an unlawful act * * *."

According to the trial judge's charge, the alleged refusal "to disperse when lawfully commanded, is a circumstance, if found to exist by a jury, to be considered in evidence, but is not itself the crime for which these defendants are indicted." This statement is amply justified when we examine the statute and the indictment. The question is, therefore, did the defendants

on March 30, 1944, with a common intent, assemble at the gate of the Weirton Steel Company's plant for an unlawful purpose? If their purpose was only to distribute literature, disseminate information, or solicit membership, and do so in a peaceable and lawful manner, then the purpose was lawful, the assemblage lawful, and the trial judge so instructed the jury. But however lawful their purpose, if in executing it they, with a common intent, committed disorderly acts in such manner as to cause sane, firm and courageous persons in the neighborhood to apprehend a breach of the peace, the assemblage became unlawful; and those who participated therein became subject to the penalties prescribed by Code, 61-6-6. This common intent could be formed before, during or after the defendants assembled, and, of course, could be inferred from acts. We do not think it has been shown, beyond a reasonable doubt, or even by a preponderance of the evidence, that on the occasion aforesaid, the defendants assembled with any common intent to commit an unlawful act. It is clear that some one connected with what is termed the "C. I. O. Union", planned to send men to one of the entrance gates of the steel company's plant to distribute literature, and to solicit membership in their union. This, without more, was not unlawful. The defendants were selected for this purpose and, according to plan, they moved in three groups of five men each. Only the first group, namely, Daniel Vadis, Steve Bartek, Anthony Getsinger, Jr., John Cercarik, and LeMar Cook, encountered any difficulty, or are charged with disorderly or unlawful conduct. Their acts and conduct furnish the excuse, valid or otherwise, for the proclamation and command of the justice of the peace to disperse, and, upon their failure to disperse, their immediate arrest.

Was their conduct such as to warrant the jury in finding that, after they assembled, or while they were in progress of assembling, they formed a common intent to engage in disorderly conduct, or to commit un-

lawful acts? We can find no evidence or circumstances in this case which convince us that the intention of the five defendants of the first group changed in any particular after they assembled at the mill gate, or in the course of that assembly. True, there is evidence that after the assemblage there was some jostling, and that vulgar, profane and even indecent language was used, but just who, if any one, was solely responsible for such language, and did the jostling, is a matter of dispute which we will not undertake to settle. On this phase of the disturbance, there was probably fault on both sides, as between the two unions involved.

We think no useful purpose would be served by discussing the evidence in this case in detail. As a matter of fact, there is little conflict in the evidence; although, of course, as in all cases of this character, different people appraise and see things differently, and to that extent their testimony differs. Two men rarely explain a particular occurrence in the same way. Undoubtedly, there was some disturbance at the mill gate on March 30, 1944. This disturbance was anticipated by all parties concerned in the dispute between the two labor unions and their adherents. The Sheriff of Hancock County, no doubt in good faith, in preparation of what has the appearance of being a test case, contacted a justice of the peace of that county, and the proclamation afterwards used by the justice was prepared in advance and printed. Newspapers were notified and their reporters were present in readiness to report whatever might occur. Photographers appeared with their cameras, all in anticipation of trouble. To save everyone from disappointment, there would have to be a measure of trouble, else there would be nothing to test, nor anything to photograph and report. The five defendants in the first group appeared. At most they tried to force literature on those unwilling to receive it, and when refused they tried to put it in the pockets, or place it under the arms of individuals. Rancor and bitterness were probably engendered by these acts, and words, accusations, and epithets began to be hurled

from both sides, and one word lead to another. However, no blows were struck; no injuries were attempted to be inflicted; nor were any sustained by any person. The battle was largely, if not entirely, confined to words, and, according to the record, both sides gave good account of themselves in that particular. As we see the case, what occurred on that occasion was nothing more than might have arisen on any occasion, where groups of virile men clash on differences over matters deemed by them to be important, if not vital, to their welfare. In such circumstances, there is likely to be anger and contention, accompanied by the use of words and accusations better left unuttered; but all occurring without any intent on the part of any one to create disorder or violate law. As we appraise this case, nothing happened on this occasion which should have supplied reasonable grounds for any apprehension upon the parts of firm, sane and courageous men that a breach of the peace would occur. There was not, in our opinion, any actual breach of the peace on the part of the five defendants who first assembled at the mill gates, and as against the other defendants no such breach is charged. There was not sufficient evidence before the jury to justify its conclusion that there was, at any time, a common intent, on the part of the defendants, to engage in disorderly conduct, or to commit unlawful acts; and unless this intent appeared from the evidence and circumstances, there could not, under the trial judge's charge, be a verdict of guilty.

We are not unmindful of the numerous decisions of this Court to the effect that in criminal cases the verdict of a jury, found on conflicting evidence, and under proper instructions in a trial court, will not be disturbed unless plainly wrong, or without any evidence to support it. We cannot say that in this case the verdict is without some evidence to support it; but, considering the charge given by the trial court, which we approve, we do say that, in our opinion, the verdict was plainly wrong, and should have been set aside.

We are of opinion that, on the record made at the completion of the evidence in the trial, the motion of defendants to strike out the evidence, and for a directed verdict of not guilty, should have been sustained, on the general theory that the State had not made a case on which a verdict of guilty could rest; not having sustained that motion, we think the defendants' instruction No. 1 should have been given, the giving of which would have obviated giving instructions Nos. 2 to 16, requested by the individual defendants; and not having given instruction No. 1, and the case having been submitted to the jury, resulting in a verdict of guilty as to all the defendants, we are of opinion that the joint motion of defendants to set aside said verdict, and to grant to them a new trial, should have been sustained.

We therefore reverse the judgment of the Circuit Court of Hancock County, entered on April 11, 1945, set aside the verdict on which said judgment was based, and award to the defendants a new trial.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*

KENNA, PRESIDENT, dissenting:

With all respect, I am of the positive opinion that the majority of the Court has misconceived the mandatory requirements that govern the settling and enrolling of bills of exception and, in addition, has, in determining the guilt or innocence of the accused, failed to attach proper importance to questions of fact that plainly appear in the transcript of the testimony that the majority treats as a part of this record. On the questions of venue, the impaneling of the jury, Governor Neely's proclamation, the introduction of photographs, the rulings on instructions, and the trial court's charge to the jury, I am in agreement.

Here we are dealing with the power to *extend the time* for signing bills of exception and entering an order mak-

ing them a part of the record and not with the actual signing and entry of that order. However, since the principles controlling the two powers are necessarily the same, no distinction will be attempted in discussing the applicable cases. Nor will the question whether the statute confers the power to extend an extension or, stating it differently, to grant more than one extension, be more than noted.

The decisions of this Court are not in harmony on the question of whether an order *nunc pro tunc* can be used for the purpose of making a bill of exceptions a part of the record after the time allowed by statute for that purpose has expired. There is no doubt that the statutory provisions are mandatory and yet, in the case of *Clonch* v. *Tabit,* 122 W. Va. 674, 12 S. E. 2d 521, this Court seems to have applied the doctrine of estoppel, in effect holding that the *nunc pro tunc* order there involved had no effect, but since the conduct of opposing counsel had brought about the delay beyond the statutory time, he was precluded from raising the question in this Court. The question is not carried into the syllabus of the *Clonch* case. The case of *State* v. *Berle,* 117 W. Va. 825, 188 S. E. 481, while it does not involve a *nunc pro tunc* order, if followed, would make merely directory all rules that require a settled practice. In that case the statutory time expired on February 1, the opinion stating that on that day a certificate, not stating its nature, was prepared and ready for signature, and was called to the attention of the trial judge, not stating by whom. The paper was not signed until March 11 and this Court treated its execution as relating back to February 1. Again the question was not dealt with in the syllabus.

Our most recent case in which the question is discussed is that of *State* v. *Tate,* 125 W. Va. 38, 22 S. E. 2d 868, holding in Point 1 of the Syllabus that a bill of exceptions signed by the trial judge after the expiration of sixty days from the term's adjournment without an extension of time is void, and stating on Page 40 of the opinion that the defect cannot be cured by an order *nunc*

*pro tunc.* The *Tate* opinion cites *Monongahela Railway Company* v. *Wilson,* 122 W. Va. 467, 10 S. E. 2d 795, opinion by Judge Fox, which concludes with this language:

> "The value of any rule of procedure depends on its uniform and consistent application to all cases presented, and we have, therefore, felt impelled to adhere to the long followed rules of procedure, which these decisions establish."

In my judgment the many West Virginia citations in the *Monongahela* opinion will be found to condemn the departure from statutory provisions held mandatory in a compelling majority of our decisions by an order *nunc pro tunc* or otherwise.

The *Tate* case being the latest pronouncement of this Court on the subject, I prefer to follow it rather than to brush aside the rule therein enunciated without comment.

However, if it be conceded that a proper order *nunc pro tunc* can dispense with the formality of perfecting bills of exception within the time allowed by statute, I think that the order in this matter was improperly entered by the Circuit Court because there was no memorandum of what really occurred upon which it could be based, the majority opinion correctly recognizing that that is a prerequisite of an order of that kind. Here what was used as a memorandum was the reporter's certified *transcript* of his stenographic notes made at the time. The transcript was not made at the time of the motion under consideration. The original stenographic notes, supported by testimony, or, perhaps, affidavit, might have been properly used. Code, 51-7-2, provides for their authenticity. But to say that a transcript certified by the trial judge as being correct as required by Code, 51-7-4, because he so remembers what took place can be used as a memorandum as to what did take place to refresh the same memory that fathered it, is certainly at least begging the question. A transcript is made subject to the memory of the trial judge. It is to be correct-

ed by his memory: not his memory corrected by it. To my mind it is perfectly clear that a memorandum upon which an order *nunc pro tunc* can be founded must be a written notation made at the time accurately showing what actually took place. A transcript made weeks later, as here, is certainly not that sort of paper.

It will not do to say, as does the majority opinion, that counsel's statement that it was his purpose to apply to this Court for a writ of error and at the same time moving for a ninety day stay of execution, bills of exception not being mentioned, operated as a memorandum indicating that he was then asking an extension of time for the preparation of bills of exception. Granting that a copy or transcript of the reporter's original stenographic notes, not the original notes made in court at the time, is in fact a memorandum, which in my opinion is open to very serious question, what actually transpired before the Circuit Judge was this:

"Mr. Riley: We would like to give notice that we intend to make application for writ of error and supersedeas and would like a stay to prepare the record. Will that stay be ninety days?"

"The Court: I suppose you will need at least ninety days for that, Mr. Riley, considering the length of this record."

"Mr. Moore: I certainly have no objection to ninety days."

"The Court: And considering the engagements of the court and its reporter for the next ninety days, I think you will need every bit of ninety days, but of course, you can easily have an extension, if that should be necessary."

"Mr. Riley: Ninety days from today?

"The Court: Yes. That is enough under normal conditions but if you need more, you can have it, of course. Naturally, we don't wish to throw any stone in the way of every proper appeal you may have. Is there anything further, gentlemen?"

"That is all."

The stay requested was granted. That was imperative at the time to prevent the convicted accused from being imprisoned and serving their sentences of thirty and sixty days while the record was being prepared and application made for a writ of error. An extension of time for the signing of bills of exception was at that moment entirely unnecessary. The court and counsel knew that that could be taken care of within sixty days from the adjournment of the then term of the Hancock County Circuit Court. A stay of execution was all that was asked and that is all that was granted. What is said in the majority opinion concerning the discussion of the time required to transcribe the testimony and prepare the record, of course applies with equal force to a stay of execution alone, and consequently means nothing. To treat counsel's statement as a memorandum indicating that a motion for extension of time was then made would certainly exclude a motion for a stay of execution. Both motions certainly were not made. To ascribe a double meaning to the one motion actually placed before the Circuit Court, would establish an extremely loose practice and would be counter to the West Virginia authorities cited in the *Monongahela* case, all of which are based upon the fact that appellate review is in no sense a matter of absolute right, drawing no distinction between civil and criminal cases, as does the majority opinion, but is a privilege which can nullify the effect of otherwise final judgments or decrees and is available only to those who strictly comply with the mandatory statutory requirements. Those requirements, in my opinion, are jurisdictional; not procedural, as stated in the majority opinion. *Crowe* v. *Corporation of Charles Town*, 62 W. Va. 91, 57 S. E. 330. Here, in my opinion, plainly that was not done. Hence the transcript of testimony is not before this Court and, since each assignment of error is based upon the evidence taken, the writ should be dismissed as improvidently awarded.

The subsequent order of June 28, 1945, granting a further sixty-day extension of time to prepare bills of exception, was entered after the trial judge had asked

counsel if it was being entered in proper time and received assurance that it was. In no event could it affect the questions under discussion.

However, treating the entire record as being here and the decision as turning upon the sufficiency of the proof, to sustain a verdict of guilty of refusing to disperse an unlawful assembly when commanded by a magistrate to do so, in my judgment the majority opinion has entirely ignored the outstanding and controlling circumstances that should determine the decision: that is, the feeling of the rank and file of the people of this country at that time toward any effort to interfere even in a small way with our "war effort", coupled with the fact that the assemblage involved was at one of the main entrances to a war plant during a change of shifts. Public feeling was then highly sensitive concerning war work. Judges should remember that commonly known fact and of it all courts should take judicial notice. The general feeling and the local circumstances both must be considered in order to decide whether the gathering at the No. 5 gate of the Weirton Steel Company's plant consisted of more than three persons bent upon a common unlawful purpose intended to be accomplished in such a way as to cause sane, firm and courageous persons to apprehend a breach of the peace or unlawful violence. If so, it was an unlawful assembly.

In March, 1944, the "all-out" world war was far from ended. Our young men were still on Guadalcanal and the Normandy invasion in Europe had not begun. A large percentage of us had close relatives in our country's armed services, several million of them being overseas. We were doing our best to support them with every nerve and fiber that we had. Weirton Steel had more than ten thousand employees at this plant engaged exclusively in the making of war material. It is not difficult to imagine that the interference with or stoppage of that work would lead to other interferences or stoppages, the combined or separate effect of which could delay the end of the war. That would cost lives. Certainly it was not

a time for the making of war profits, nor for a labor organization to demand a share of the loot, if loot there were. People dreaded curtailed war production more than they feared war profits. That they could deal with later. Some looked upon interferences with production as being the enemy boring from within. Much more could be said in describing the high tension under which our people labored in the spring of 1944 and to illustrate the danger of an outbreak of feeling that gave rise to the circumstances of this case.

March 30, 1944, was pay day at the plant of Weirton Steel and between one-thirty and two-thirty of that day was the hour to change shifts and pay off. For some reason that does not clearly appear the officers of the CIO as well as the public authorities, perhaps informed by Weirton Steel, expected some unusual occurrences at gate 5 of the Steel Company's plant on that day and at that hour. An officer of the CIO had informed a New York newspaper known as "P. M.", as well as the Pittsburgh Sun-Telegraph and the Pittsburgh Press, and reporters and photographers had been assigned to Weirton for the occasion. The Sheriff of Hancock County and eight special deputies, the Chief of Police of Holliday's Cove, a corporal and two troopers of the Department of Public Safety, and a justice of the peace were also on hand. The Industrial Steel Workers Union, CIO, had distributed its literature and matches at the plant of Weirton Steel a number of times before without interference and evidently without sought publicity. On this occasion they had three teams of five men each who were to alternate, each team working the gate on relays of fifteen minutes until a period of one hour and a half had been covered. The testimony of the State is to the effect that when the first team went on duty there was a crowd; probably fluctuating, estimated to have been between one hundred and two hundred and fifty people in the immediate vicinity of the Number 5 gate. They went to the pedestrian entrance, about five feet wide between the wall around the grounds of the plant, and a gate

house manned by company police for the purpose of identifying those entering the plant. They blocked the pedestrian entrance so that some of the employees going in or out were obliged to force their way through, and offered CIO literature, at the same time exclaiming: "Be an American." "Join the CIO." "Don't be a company stooge." If the employees going into or leaving the plant refused to accept their printed matter they forced it under the employee's arm or into the pocket of his coat, using imprecations such as "yellow bastard", "son of a bitch" and "piss on you".

It was then that the justice of the peace near the entrance read his so called proclamation declaring the assembly to be unlawful and commanding it to disperse. According to the State's evidence it was read in a clear and audible tone and in addition copies of it were posted at several conspicious places near the entrance of the plant by the Sheriff of Hancock County. It is clear that each of the three teams of five men were informed of the magistrate's command to disperse and that before they were arrested they refused to do so.

As contrasted to the testimony of the State, that of the defendants is to the effect that they offered CIO leaflets to the employees leaving and entering the plant, saying: "Have a leaflet, sir", and if the employee declined to accept the printed matter he was permitted to pass without molestation of any sort. They deny that they used any other form of address, say that they called no names, used no vulgarity, and did not try to force their literature into anyone's possession. They further testify that the gathering at the gate of the plant, excluding employees who were going in or out without stopping, did not exceed eighteen or twenty persons. On this clear cut issue of fact the jury believed the testimony of the State. The case as to the sufficiency of the evidence then comes here on the question of whether the testimony of the State, disregarding that of the defendants that conflicts therewith, is sufficient to prove an unlawful assembly in which the defendants participated. The decision

of that question, to my mind, involves also the decision of what effect, if any, is to be given to a judge's or justice's command to disperse under Code, 61-6-1.

Our statute does not define riots, routs or unlawful assemblies but permits the penalties attached to each to rest upon the common law offense, making it the mandatory duty of judges and justices " * * * to go among, or as near as may be with safety, * * *" persons forming gatherings of that sort and command them to disperse. The statute furthermore makes it a misdemeanor for a judge or justice having notice of an unlawful assembly to fail to proceed immediately to the scene and exercise his authority.

There is nothing novel nor experimental concerning this duty imposed upon judges and justices of the peace to suppress unlawful assemblies. Even the early statutes did not create the offense nor define it. They dealt entirely with the question of enforcing the common law and as early as the reign of Henry IV (1399-1413) an English statute expressly provided that the command to disperse should be accepted as conclusive proof of the fact that the assembly was unlawful. Statutes, 13 Hen. 4 Ch. VII. This was followed by an early, Virginia statute to the same effect. 12 Hening's Statutes Ch. XLV-III (1786). Our statutory provision, borrowed from the Virginia Code of 1849, now omits the provision of the effect to be given to the command to disperse. It simply makes it a mandatory duty of the named officers and imposes a penalty upon the failure to perform by either a judge or justice of the peace. As I view the provisions of Code, 61-6-1, it was certainly not the legislative purpose to require judges and justices of the peace to confront a recognizedly hazardous situation for the purpose of there making a futile gesture. Consequently, I believe that although the omission of the provision treating the command as conclusive proof of an unlawful assembly undoubtedly now precludes the courts from so regarding it, the provisions of the act make it quite apparent that it is still the legislative purpose to attach some conse-

quence and some effect to the act performed, as is indicated by the power conferred upon the judge or justice to order arrest without warrant as for a misdemeanor committed in his presence and to commit to jail in the absence of a recognizance to appear before the court having jurisdiction of the offense. Upon a prosecution and trial, in my opinion, certainly some probative value must be attached to the command to disperse on the ground that the assembly is unlawful. The only manner in which that can now be satisfactorily done is to treat it as creating a rebuttable presumption. Otherwise the mandatory provision of the statute is meaningless. In this particular case, in the absence of proof on the part of the State other than the command to disperse by a justice of the peace and the failure to comply, the testimony of the defendants would likely have been sufficient to overcome such a presumption. But with the State's evidence directly contradicting that of the defendants in every detail material to the issue, followed by a verdict of guilty and sentence by the trial court, I am convinced that a reversal is a miscarriage of justice that will bring about less respect for the law and for its officers.

Of course, if the purpose of the teams of five men each was to distribute their literature in an orderly and peaceful manner, as indicated by the testimony of the defendants, the assembly was not unlawful. On the other hand, if it was the purpose of three or more to distribute the CIO printed matter by standing at the narrow pedestrian gate so that those entering or leaving would be obliged to pass between them, forcing their way in or out by jostling and pushing, poking leaflets into the pockets and under the arms of those unwilling to receive them, accompanied by the use of opprobious epithets, then the assembly was unlawful. It does not matter what their purpose in coming to the plant was, if, after their arrival they acted in unison to achieve an unlawful purpose or a lawful purpose unlawfully. See 46 Am. Jur. 131.

As I view this case, the majority has made the mistake of treating it as a prosecution of CIO organizers unlaw-

fully assembled. In most, if not in all, instances, an unlawful assembly is composed of partisans taking opposite sides of a controversial question. It must be of such a nature as to cause a sane, firm and courageous person to fear a breach of the peace. Certainly if the assembly now being considered by the Court had comprised only CIO field men there would have been little danger of their disagreeing and the danger of violence would have been considerably reduced. However, it did not, nor were the CIO workers the only ones commanded to disperse. The State's proof indicates that in addition to them there was a considerable gathering at the corner that did disperse upon the justice's command. So far as this record shows, the fifteen men were the only ones who refused categorically to obey the command to disperse. They did so because they were there under orders from their union superior that they regarded as paramount to those of a peace officer. They so stated. When the justice's proclamation was read and his command to disperse was made the gathering at the gate comprised, according to the State's proof, CIO workers as well as those being forced unwillingly, as described, to accept leaflets. That being so this is not a trial to determine who started the difficulty, who originated the trouble, or whether the original purpose was criminal, as, with all respect, I believe the majority is tangentially treating it. The opinion by the majority speaks of the trouble having been caused by "fault on both sides as between the two unions involved", and seems to reason that the conviction of the defendants should be reversed, at least in part for that reason. I believe that "fault on both sides" is exactly what can easily make an assembly unlawful. That being so, both sides, not simply those organizing the meeting of fifteen CIO workers, if, after being commanded to disperse they refused to do so, were guilty of unlawful assembly. Under the record before us, the fifteen defendants were the only persons refusing to disperse and depart after the assembly was declared by the justice of the peace to be unlawful. There is proof to the effect that the command to disperse was obeyed by

everyone but them. Refusal to disperse makes everyone remaining a participant in an unlawful assembly. Under the statute a justice can command those present to assist him and upon their refusal they become rioters, equally guilty of any crime committed by others who refuse to disperse. That was done in this instance.

To sum up, I believe that the State's proof shows clearly that after reaching the scene the teams of five men each showed plainly by their conduct that they were there for an unlawful purpose, i. e., to force CIO leaflets upon employees of Weirton Steel unwilling to receive them; that this occurred at a very critical period of our war with Japan and Germany and when popular feeling was aflame with patriotism and keenly resentful of whatever might be construed as interfering with war production; that the partial blocking of the entrance to the plant, the cursing and the jostling, were sufficient to cause experienced peace officers, who are certainly to be regarded as sane, firm and courageous, to testify as a matter of established fact that serious breaches of the peace were to be feared; and that the justice's proclamation should be given probative value as at least fixing the common law essential of criminal intent and creating a rebuttable presumption of unlawful assembly. When those facts and principles are considered in connection with the fact that the CIO workers had notified newspapers in both New York and Pittsburgh of the day and hour of going to the gate of the Weirton plant and that then those newspapers were represented on the ground by reporters and photographers, there is certainly no room for regarding it as a usual occurrence. Neither can it be regarded as a contest between two labor unions, the CIO holding in utter contempt the so called "company union" as being an organization controlled and dictated to by the employer and used as an instrument by which it bargained with itself concerning wages and working conditions, and the members of Weirton Independent Union looking upon the active field men of the CIO as racketeers who made a comfortable living out of creat-

ing discord through jurisdictional strikes and who would lose their jobs if and when all employers and employees worked in harmony. That raw disagreement was, of course, the explosive factor at the No. 5 gate of Weirton Steel the afternoon of March 30, 1944. It was that, coupled with the stated overt acts done in a crowd, that Justice of the Peace Ferrari declared to be an unlawful assembly, commanded to disperse, and further commanded all present to assist him in arresting those who refused to obey, as provided by statute. What is referred to as the "so-called proclamation" of the justice of the peace preserved an accurate written record of what was in fact done by him. It called to a halt altercations and quarrels concerning local disagreements and told all who were informed concerning it that the refusal to disperse would be a criminal offense against the public interests. To my mind, giving it no probative effect and attaching to it no importance is directly in the teeth of both the wording and the history of the statute. As stated, I would hold that it creates a rebuttable presumption of an unlawful assembly, that that presumption has not been overcome in this case, and that the defendants below knowingly refused to obey the justice's command to disperse. I would therefore affirm the judgment of the Circuit Court of Hancock County.