# CHARLESTON.

## STATE v. LONDON McKINNEY.

Submitted April 5, 1921. Decided April 12, 1921.

1. CRIMINAL LAW—*Evidence of Trailing of Accused by Bloodhounds Held Admissible.*

  Evidence of the trailing of a person accused of the commission of an offense, from the place of the perpetration thereof to the place of his arrest, by blood hounds shown to be of

pure blood, to have acuteness of scent and power of discrimination between persons by means thereof, to have been trained in the trailing of human beings and to have successfully trailed and identified other persons accused of crime, as having been at the scene of commission thereof, is admissible on an issue as to his identity, as a person who had been at the place of the perpetration of the offense of which he is accused, at or near the time thereof. (p. 405).

2.   SAME—*Admissibility of Trailing of Accused by Bloodhounds Held Not Precluded by Issue of Whether Accused Traveled on Foot or Horseback.*

Admissibility thereof is not precluded by another issue as to whether the accused traveled on horseback or afoot, there being evidence tending to prove each hypothesis, nor by a preponderance of evidence, if any, in favor of the former. (p. 406). '

3.   SAME—*If Evidence Tends to Prove Facts Relevant to Any Issue it is Admissible.*

Upon an inquiry as to the admissibility of evidence, its weight or probative value is not the criterion or test. If it tends even slightly to prove a fact relevant to any issue in the case and material or forceful in the determination thereof, it is admissible. (p. 406).

4.   SAME—*Admission of Accused of Commission of Offense Some Hours Later, Stating Motive Therefor, Held Inadmissible as Self-Serving and Not Part of Res Gestae.*

A statement of one accused of an offense, made some hours after the act in question, admitting it and stating the motive for commission thereof, is inadmissible, it being no part of the *res gestae* and being a self-serving declaration. (p. 406).

5.   SAME—*Evidence That the Person Shot Had Driven His Wife From Home, and That She Came to the Home of Accused Held Improperly Excluded.*

Upon the trial of a person charged with having maliciously shot the husband of his sister, in which there is evidence tending to prove facts which might be deemed by the jury to amount to provocation generating heat of blood, or to justification of the shooting on the ground of self-defense, it is improper and prejudicial, to exclude evidence tending to prove that the wife, on coming to the home of the accused, shortly before the shooting, was in a bruised and lacerated condition and had said her husband had beaten her and driven her from home, offered in connection with evidence that the accused had gone to the home of the victim, at the request

of the wife, on a humane and proper mission, in the attempt to perform which the shooting occurred.   (p. 406).

6.   SAME—*Slight Evidence Sufficient to Justify Instructions Submitting Hypotheses it Tends to Prove.*

Slight evidence is sufficient to justify the giving of instructions submitting the hypotheses it tends to prove. (p. 408).

7.   SAME—*Instruction as to Reasonable Doubt of any Juror Should be Given.*

An instruction on the subject of the legal requirement of unanimity of the jury in the finding of a verdict, which, if given, would advise the jury that, if any juror, after due consideration of the evidence and consultation with his fellows, has reasonable doubt of the guilt of the accused in a criminal case, it is his duty not to surrender his own convictions, simply because the other jurors are of a different opinion, is correct, and should be given upon request, unless its subject is covered by some other instruction given in the case. (p. 409).

Error to Circuit Court, Summers County.

London McKinney was convicted of malicious shooting, and he brings error.

*Reversed and remanded.*

T. N. *Read* and R. F. *Dunlap,* for plaintiff in error.

E. T. *England,* Attorney General, and R. A. *Blessing,* Assistant Attorney General, for the State.

POFFENBARGER, JUDGE:

Having been convicted of the malicious shooting of J. G. McKinney, the plaintiff in error, London McKinney, complains of the judgment entered on the verdict, which imposes upon him imprisonment in the Penitentiary of this State, for the period of six years.

An assignment of error is based upon the overruling of a motion to quash the indictment, but nothing is said in argument in support thereof.   The indictment is in the usual form and no defect therein is perceived.

A statement of the peculiar facts of the case is necessary to a clear comprehension of the other rulings complained of. While on his porch, early in a November evening, but after dark, J. G. McKinney was shot in the face, the ball striking

the right cheek, knocking out some teeth, breaking the jaw bone and, divided into parts, lodging in various places in the neck and head. The shot came from the neighborhood of his gate, and, at the time, his dogs were at that point apparently resisting entrance, and he had hissed them on and may possibly have thrown a stick which, the accused says, struck him before he fired the shot. J. G. McKinney says he hissed the dogs, under the impression that the attempted intruder into the yard was an old sow of his, that had been in the habit of breaking in. He saw nobody at the gate and the identity of the person who did the shooting was not discovered until later. At the time of the injury, he was alone on his porch, but his children, five or six in number, were in the house. The age of the oldest of them was about fourteen years. After the injury, he called them and they managed to get him in the house. Neighbors and officers, being notified, came in to render assistance. The aid of a man having two young blood hounds was secured. The blood hounds were taken to the point from which the shot seemed to have come, and there they took up the trail and followed it for a distance of about eight miles, to the home of Luke McKinney, the father of the accused. In their pursuit of the trail, the dogs were accompanied by several persons among whom were two deputy sheriffs, two constables, a justice of the peace and the owner of the dogs. Having led the crowd to the front door of the home of Luke McKinney, the dogs were taken behind the house and kept there until London McKinney was aroused and taken from his bed and to a point seventy-five or a hundred yards from the house. Then they were again put upon his trail and went to him and gave manifestations of their identity of him as the person they had been trailing. Thereupon, he admitted he had been at the house of J. G. McKinney, on the previous evening, at about seven o'clock or seven thirty and also that he had fired the shot. After this confession he was placed under arrest and subsequently repeated the admissions. On the trial, he testified in his own favor and there admitted that he had done the shooting with a .22-caliber Winchester rifle, having a magazine

capacity of sixteen cartridges, which he had carried from his home and back to it.

There is conflict in the evidence as to what preceded the tragedy, led up to it and may have entered into the purposes and mental attitude of the accused. Before noon of the day of the shooting the wife of J. G. McKinney, who was also the sister of the accused, came to the home of Luke McKinney and remained there until after the shooting. She and her husband both claim she went there merely to visit her father and others of the family. The accused offered to prove she had come to her father's house with bruises on her face, loosened teeth, a severe laceration of the knee and other injuries, and stated that her husband had beaten her and driven her from home. He was not permitted to prove her physical condition at that time. The court, however, permitted him to prove she had said her husband had accused her of things she was not guilty of, and had told her to go to her father's home and stay a few days, until they could get things fixed up; that she had told them of some little troubles she and her husband had had; that she had then asked her father to go and see her husband and endeavor to obtain his consent to her return and effect a reconciliation; that he had refused to do so; and that she had then requested her brother, the accused, to do so, and also to see if her husband was there, and, if not, to take care of the children for the night. He was also permitted to prove the communication by the wife on that occasion, of threats made by her husband against her and all of her family. The threats were to the effect that he had expressed an inclination to go down there and call them all out and shoot them down, one at a time, and that he intended to send her home and get them all together and kill them by blowing up the house with dynamite.

On the witness stand the wife denied communication of such threats, the making thereof and any trouble between herself and her husband. She also denied having requested either her father or her brother to go to her house that night, and knowledge of his having gone there. She admitted she knew he had left the house in the evening, but denied that she knew where he had gone. Although the father and unmarried sister

say they knew he had been requested to go, they denied knowledge of his having gone. He himself said he did not promise to go, when requested, but had afterwards concluded to do so, and had gone without giving notice of his intention so to do.

He says he made the trip both ways on horseback, and, having hitched his horse at the road, started to the house. Just before he reached the gate, which stood about fifteen or twenty feet from the porch, the dogs became aroused and endeavored to break through. Knowing they were vicious, he kept his eye on them, and just as he was about to place his hand on the gate, a stick of wood thrown from the porch struck the gate and himself, making a slight bruise below one of his eyes. He further says that, after having recovered slightly from the blow thus received, he saw J. G. McKinney, by means of the light from a window, stoop as if he were picking up something and partially rise with a gun in his hands, as he thought. Thereupon, he fired the shot. Not knowing the result thereof and fearing to venture into the unknown situation, he walked back to the road, mounted his horse and returned home, arriving there about nine o'clock. The father and sister were apprised of the shooting before his return, and the former says he had left home for the purpose of obtaining information about it and rendering assistance, and met the son on the road as he was returning, but he was not then informed that he had done the shooting.

Although the accused and other witnesses swore he had ridden a certain horse on the night of the tragedy, witnesses for the state say they discovered no horse tracks at the point at which he says he hitched the horse, and also that the hounds in their trailing, seemed to follow the tracks of a man, and not those of a horse. Under these circumstances, whether the accused made the trip on horseback or on foot was a question for jury determination. In view of this conflict, it was not improper to admit the evidence of the trailing of the accused by the bloodhounds, if it was sufficiently shown that they were such hounds, that they had acuteness of scent, and power of discrimination between persons, and had been trained to trail human beings. *Pedigo* v. *Commonwealth*, 103 Ky. 41; *Hodge*

v. *State,* 13 Sou. 385; *Simpson* v. *State,* 20 Sou. 573; 1 Wigmore, Evidence, sec. 177, p. 226. The owner of the dogs testified that they were of pure blood, that they had acuteness of scent, that they had been trained to track human beings, and that on more than one occasion, they had successfully trailed and identified persons accused of crime.

Less definiteness and positiveness in the evidence for the State, as to how the accused traveled, than in that adduced by him, does not render the bloodhound evidence inadmissible. It suffices that there is some evidence of his having traveled on foot. Nor does his evidence as to the lines of his return bar it. Whether he and his witnesses stated it correctly was a question for the jury. He may have been able to walk or run the distance stated in about two hours. If not, the evidence that he traveled afoot tends to prove he did not return by 9 o'clock.

In this ruling, we are not dealing with the probative value of such evidence. Whether it alone would be sufficient for identification of the accused, as a person who had been at the scene of the shooting immediately before, is an entirely different question. In view of the admission of the accused, it cannot arise here. On a question of mere admissibility of evidence, its tendency to prove a relevant and material fact, not its weight or value, is the sole inquiry.

Mrs. J. G. McKinney's denial of communication of threats of her husband against her and her family to John Cyrus and Mrs. Ruth Taylor was not excluded. It was at first, probably on account of the form of the question, but it was immediately afterwards admitted, and Cyrus and Mrs. Taylor were permitted to contradict her.

The offer to prove the accused had confessed the shooting to his sister on his return was properly rejected. Having been made hours after the shooting, the confession was no part of the *res gestae.* Besides, it was a mere self-serving declaration.

Refusal to admit evidence tending to prove the physical condition of Mrs. J. G. McKinney on her arrival at the home of her parents, indicating cruel and abusive treatment, and her statement that it had just been inflicted by her husband, was erroneous. Such condition, if it existed, and the declara-

tion, if made, were facts and circumstances constituting in part, according to the theory of the defense, inducement to the admitted conduct of the accused, including the act on his part, of which the State complains. All such facts, whether probative of guilt or innocence, are part and parcel of the transaction, and, if they have any probative value at all, in either direction, they are admissible. *State* v. *Prater,* 56 W. Va. 132; *St. Clair* v. *United States,* 154 U. S. 936; Whar. Ev., sec. 259.

Taken in connection with the relationship of the parties, including previous unbroken friendship between the accused and his victim, these circumstances have important bearing upon the mental attitude and intent of the former. They enter into the motive with which he made the trip to the home of the latter and his estimate of the situation in which he suddenly found himself, at the time of the shooting. The immediately preceding violence of J. G. McKinney toward his wife and his banishment of her from his home, if proved, make out an entirely different case, from that which was presented to the jury. He went on a mission to a man who had partially executed his threat upon one member of the family, not a man who had merely made a possibly idle threat. He went to intercede for a badly abused sister and to protect her young children, if he should find them deserted, not to a husband and father who had merely had a few unpleasant words with his wife and ordered her to leave home. If he went upon such a mission, under such circumstances, the fact that he went armed takes upon itself a character and coloring it would not have in the case of a visit to a quarrelsome, but harmless, man, for such a purpose. The previous anger, inhumanity and enmity, if any, taken in connection with the suddenness and violence of the assault, as described by the accused, may have been a considerable factor in his determination of the question of imminent danger to himself and the necessity of resort to measures of protection.

Again, the shot may have been the result of an impulse suddenly aroused by the hissing of the dogs and the blow, in a mind perfectly free from malice and engaged in the execution of a manifestly humane and proper purpose having a broader

and deeper basis in the violence inflicted upon the sister, than it could otherwise have had. Whether the accused, if guilty of an offense, fired the shot maliciously or merely in heat of blood, arising upon sufficient provocation, is a very important inquiry in the case, since the punishment of the two offenses are radically different, and his motive, determinable, in part, by the information in the light of which he acted, has obvious and important bearing upon it. His visit with a good purpose would be very different from one made with an evil purpose, and the purpose, whatever it was, constituted an element of his mental attitude at the moment of the assault upon him, whether intended or not, and his defensive or retaliatory act. For these reasons, the ruling in question was both erroneous and prejudicial.

That the accused was struck with a stick of wood or other missile thrown by his victim is not uncontroverted. Evidence was adduced, of an admission on his part that the bruise below his eye was caused by an accident in the cutting of firewood, not an unusual occurrence with persons cutting stove wood and kindling. Hence, the State's instruction No. 4, submitting, among others, the issue as to provocation for the shooting, did not improperly require a finding as to its existence. For the same reason the court did not err in the giving of the State's instruction No. 6, submitting, among others, an inquiry as to whether there was an overt act on the part of J. G. McKinney, indicative of hostile and dangerous intent and purpose toward the accused. He neither denied nor admitted the throwing of a stick, but the court was not bound to assume the truth of the evidence of the accused, as to that issue. However, it might be in the absence of contradiction of such testimony, the contradiction thereof found in the evidence of his inconsistent admission made the issue one for jury determination.

Instruction No. 11 requested by the defendant was properly refused. If given, it would have told the jury there could be no conviction, if they believed the shooting occurred in an affray and malice did not exist in the mind of the accused at the beginning of the affray. In this it manifestly deviates

from the law.   Malice may arise in the course of an affray. *State* v. *Taylor*, 57 W. Va. 228.

No good reason is perceived for refusal of instruction No. 4 requested by the defendant, unless it falls within the scope of some other instruction given.   Its subject matter was the legal requirement of unanimity of the jury in the finding of the verdict, and it would have advised them that, if any juror, after due consideration of the evidence and consultation with his fellow jurors, should entertain a reasonable doubt of the guilt of the accused, it was his duty not to surrender his own convictions simply because the others were of a different opinion.   No misleading element is found in it and it does not import justification or encouragement of obduracy or arbitrariness on the part of an individual juror.   A majority of the court are of the opinion, however, that the subject is sufficiently covered by instruction No. 2 given for the accused.   I do not think so, because the primary subject of that instruction was presumption of innocence and the requirement of unanimity in the verdict, is a subordinate, if not an incidental, subject or element thereof.

For the erroneous exclusion of evidence herein noted, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and remanded.*