IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

_____

No. 22-0467

_____

FILED

**November 13, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent.

v.

ANDREW JACKSON MCCAULEY, JR.,
Defendant Below, Petitioner,

_____

Appeal from the Circuit Court of Morgan County, West Virginia
The Honorable Debra McLaughlin, Judge
Civil Action No. CC-33-2021-F-35

AFFIRMED
_____

Submitted: October 9, 2024
Filed: November 13, 2024

J. Daniel Kirkland, Esq.
Arnold & Bailey, PLLC
Charles Town, West Virginia
Counsel for Petitioner
Assistant Attorney General

Patrick Morrisey, Esq.
Attorney General
Michael R. Williams, Esq.
Solicitor General
William E. Longwell, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review." Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

2.      "'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Point 2, Syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946). Syllabus Point 1, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978)." Syl. Pt. 1, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

3.      "'"A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927).'

i

Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978)." Syl. Pt. 2, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

4.      "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis,* 204 W. Va. 58, 511 S.E.2d 469 (1998).

5.      "The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both 'reliable' and 'relevant.' Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, 511 U.S. 1129, 114 S. Ct. 2137, 128 L.Ed.2d 867 (1994), the reliability requirement is met only by a finding by the trial court under Rule 104(a) of the West Virginia Rules of Evidence that the *scientific* or technical theory which is the basis for the test results is indeed 'scientific, technical, or specialized knowledge.' The trial court's determination regarding whether the scientific evidence is properly the subject of scientific, technical, or other specialized knowledge is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' W. Va. R. Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement is under an abuse of discretion standard. *State v. Beard*, 194 W.Va.

740, 746, 461 S.E.2d 486, 492 (1995). Syl. Pt. 3, *Gentry v. Mangum,* 195 W. Va. 512, 466 S.E.2d 171 (1995)."

6.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

7.      "Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed." Syl. Pt. 5, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

WOOTON, Justice:

Petitioner/defendant below, Andrew Jackson McCauley, Jr., appeals the May 23, 2022, order of the Circuit Court of Morgan County, West Virginia, wherein petitioner was resentenced[1] for purposes of appealing his convictions for first-degree murder, death of a child by a custodian, and concealment of a deceased human body—all charges stemming from the death of his girlfriend's fifteen-year-old daughter who lived in the same household as petitioner. On appeal, petitioner contends that the court erred by: 1) denying his motion for a change of venue; 2) admitting evidence and testimony from a cadaver dog handler; and 3) failing to direct a verdict in petitioner's favor on the ground that the evidence was insufficient to support his convictions of first-degree murder and death of a child by a custodian.

After careful review of the parties' briefs and oral arguments, the appendix record and the applicable law, we find that the circuit court committed no error and therefore affirm its rulings.

---

[1] Petitioner was sentenced to life without mercy for his first-degree murder conviction; not less than fifteen years to life for the death of a child by custodian by child abuse conviction; and not less than one nor more than five years for the concealment of a deceased human body conviction, with the sentences to be served consecutively.

1

# I.  FACTS AND PROCEDURAL HISTORY

This case involves the disappearance and murder of R.C.,[2] a fifteen-year-old female who lived with her mother, her brothers, and her mother's boyfriend, the petitioner herein. The blended family lived together for approximately a year and a half prior to R.C.'s murder in May of 2019.

R.C.'s mother C.O. last saw R.C. before leaving for work at approximately 3:30 p.m. on May 7, 2019; R.C. was at home that evening with petitioner and her two brothers. When she returned from work around 10:30 p.m., she recalled that petitioner and R.C.'s brothers were asleep in the living room. She did not see R.C. at that time, but noticed that the light was on inside R.C.'s bedroom before she went to bed.

R.C.'s boyfriend testified that, as was normal in their relationship, R.C. had Facetimed him during the evening of May 7, 2019 at approximately 10:29 p.m. Although the pair would typically remain on a Facetime call for many hours and often through the entire night, even while they were sleeping, their call was disconnected approximately two hours later, at 12:30 a.m. on the morning of May 8, 2019. While the Facetime call was still connected, but after the boyfriend had stopped monitoring the call, R.C. sent him text

---

[2] Due to the sensitive nature of the facts involved in this case, we use initials where necessary to protect the identity of the victim. *See, e.g.*, W. Va. R. App. P. 40(e) (restricting use of personal identifiers in certain cases); *In re I.M.K.*, 240 W. Va. 679, 682 n.1, 815 S.E.2d 490, 493 n.1 (2018); *In re S.H.*, 237 W. Va. 626, 628 n.1, 789 S.E.2d 163, 165 n.1 (2016).

messages stating "Shh, don't say anything about it so he can hear everything," at approximately 11:01 p.m. on May 7, 2019, "I'm scared," approximately fifteen minutes later and finally "Babe" at 11:17 p.m. At trial the boyfriend testified that "Shh, don't say anything about it so he can hear everything," meant "not to unmute [himself on the FaceTime call] because [petitioner] was in the room. He could hear if I would have said something;" unfortunately, the boyfriend had fallen asleep prior to receiving these messages. His later attempts to contact R.C. went unanswered.

When C.O. awoke on May 8, 2019, she discovered that R.C. was not at the house and assumed that she had already left for school. C.O. testified that she drove R.C.'s brothers to school that morning, after which, upon her return to the house, she found petitioner's cell phone.[3] She also noticed that petitioner had been texting their former employer, Don Morgan, early that morning, which she testified was "odd."

Mr. Morgan was familiar with R.C.'s family. He had previously been their landlord and had previously employed both C.O. and petitioner, but was not on good terms with either of them in May 2019. Mr. Morgan informed investigating officers that petitioner sent him five text messages and called him twelve times in the early morning hours of May 8, 2019. One of the texts stated, "[w]as going to see if I could stay for a few

---

[3] The Federal Bureau of Investigation analyzed petitioner's phone records, creating a "pattern of life analysis" indicating that this was unusual behavior as petitioner always took his phone to work.

3

hours." Mr. Morgan did not respond, assuming that petitioner and C.O. were fighting and not wanting to get involved.

Johnnie Walter, petitioner's co-worker, testified that he ordinarily drove petitioner to work. On May 8, 2019, he picked petitioner up from his house around 5:30 a.m. in a green Dodge Ram King Cab pickup truck (hereinafter "the green truck"). Mr. Walter was accompanied by his wife, Donna Walter, and petitioner's nephew, Christopher McCauley. Although petitioner was typically hard to awaken in time to be picked up for work, on May 8th petitioner called Mr. Walter more than thirty minutes before Walter ordinarily picked him up and told him that he was ready to go, which had never happened before. The group dropped Ms. Walter off at work and the men continued to the Red Hill subdivision in Hedgesville, West Virginia, where they worked for Howard Ruark, a contractor. Mr. Walter testified that Mr. Ruark directed petitioner and him to do a job in another subdivision, Tabler Estate, a fifteen to twenty-minute drive from the original worksite. Before leaving for the new worksite, petitioner got three heavy-duty contractor-grade trash bags from Mr. Ruark, purportedly because he needed them for the other job. Shortly after arriving at Tabler Estates Mr. Walter and petitioner received a call advising that they needed to return to Red Hill for a different assignment. They returned to Red Hill and snorted cocaine, after which petitioner left in the green truck shortly after 9:00 a.m., telling Mr. Walter he was going to meet a girl.

4

Around 10:00 a.m. that same morning, C.O. received a call while at work from petitioner's former girlfriend, Denise Deaver, who advised that she had driven past petitioner's house and noticed a green truck parked in an odd way, backed in between the house and a small shed next to the house. And around noon Mr. Ruark messaged C.O. to ask if petitioner was coming back to the job site that day, since he had still not returned.

Mr. Walter testified that petitioner returned to the work site in Red Hill in the green truck between 2:00 and 2:30 p.m. When petitioner returned, Mr. Walter noticed a bucket of drywall had spilled in the back of the green truck, which petitioner advised was due to "driving like a maniac whipping turns." Petitioner explained his long absence from the job site, claiming that he was supposed to meet a girl in Spring Mills but he ended up having to drive to Falling Waters.[4]

After C.O. was unable to contact R.C., learned from her mother that R.C. did not return home from school, and learned in a call from Morgan County Schools that her daughter was not in school that day, she contacted Morgan County 911 to report her daughter missing. When asked the following day, C.O. granted law enforcement permission to search R.C.'s bedroom; the search revealed that it was in a state of disarray, which was not consistent with how R.C. typically kept the room. Officers located R.C.'s

---

[4] Mr. Walter testified that he was familiar with the road where R.C.'s body was located and that it contains numerous sharp turns that could cause a bucket of drywall mud to fall over easily.

wallet, money, school identification card and glasses in the bedroom—all items which signified to law enforcement that her disappearance was not consistent with the typical actions of a runaway. Officers also seized physical evidence including a pillow, a blanket and a Victoria's Secret ribbon, each of which appeared to have blood on it. Evidence presented at trial established that a mixture of R.C.'s blood and saliva was present on her sheets, pillow, and the ribbon obtained from her bedroom.

Brandy Eggeman, a certified human remains detection dog handler with First Landing K-9 Search and Rescue, a volunteer organization, testified that she was contacted by law enforcement to assist in the investigation into R.C.'s disappearance on May 12, 2019. Ms. Eggeman, who was qualified as an expert in human decomposition detection at trial, testified that she examined the green truck on May 15, 2019, the day before R.C.'s body was discovered, and that K-9 Rock alerted to an odor of human decomposition—signifying the presence of blood, tissue or bone—in the truck bed near the left wheel well.

On May 16, 2019, R.C.'s body was discovered in a rural area of Berkeley County, in an area known as Sleepy Creek Mountain. Near the body officers found two Woodbine roofing screws that matched the roofing screws found in the green truck and in petitioner's tool belt. Officers found a chalky white substance on R.C.'s body which was consistent with the drywall mud from the bed of the truck. The officers also found this chalky substance on the road and on vegetation near the body. Laboratory analysis revealed that this material contained some of the same chemical composition as the substance

6

located in the truck bed and officers established that the chemical structure can be affected by the atmosphere and environment. Additionally, they collected three contractor-grade trash bags at the scene that were partially wrapped around R.C.'s body, at least one of which contained some of R.C.'s clothing.

After the discovery of R.C.'s body, Deborah Clavette, who lives near Sleepy Creek Mountain, reached out to law enforcement to advise that at approximately noon on May 8, 2019, she saw a male who matched petitioner's description sitting near where the body was discovered in an older model Dodge Ram truck that matched the description of the green truck petitioner was driving that day. Per Ms. Clavette, the emergency flashers on the truck were activated, and because of that she "drove up and I slowed down, I was going to ask if he was lost and he was flagging me by . . . with his head sort of turned . . . like, he didn't want me to see."

Petitioner gave statements to law enforcement both before and after R.C.'s body was discovered.[5] Petitioner initially denied leaving the house in the early morning

---

[5] Petitioner also voluntarily provided his phone to investigating officers, *after* deleting Facebook Messenger texts, including texts he had sent to R.C. The investigating officers also obtained a search warrant for petitioner's and R.C.'s phone records, which substantiated Mr. Morgan's report to the investigating officers and showed that petitioner had called him twelve times between 1:54 a.m. and 2:23 a.m. on May 8, 2019, and sent him five text messages between 2:28 a.m. and 3:41 a.m. The State presented testimony at trial that R.C.'s phone disappeared from the cell phone network on May 8, 2019 at 3:13 a.m. and they were never able to locate the phone. Petitioner's phone records also showed that he called R.C. multiple times from a blocked phone number (meaning that petitioner (continued . . .)

hours of May 8, 2019, but later revised his story, claiming that he left home on foot to purchase drugs in the early morning hours. This revised story was substantiated by the testimony of the individual who sold drugs to petitioner, along with Facebook GPS coordinates that were collected by law enforcement. Petitioner explained that he repeatedly attempted to contact Mr. Morgan in the early morning hours of May 8, 2019, because he had drugs and was looking for a place to hide.

Concerning his whereabouts on May 8, 2019, petitioner told the investigating officers he was at work all day, withholding any mention of the fact that he had left the workplace for approximately five hours, allegedly to meet a girl. After learning that petitioner had been untruthful concerning his whereabouts, officers canvassed nearby businesses and private residences to obtain surveillance video showing the location of the green truck on the day in question. The State introduced petitioner's two recorded statements at trial, and used the surveillance videos at trial to track petitioner's movement between Berkeley and Morgan Counties, and to impeach his credibility regarding what he said in his recorded statements about his route of travel. The State also presented evidence

---

had caused his identity or phone number not to display on the recipient's phone) in the early morning hours of May 7, 2019, approximately twenty-four hours before the phone disappeared from the cell phone network; yet he made no attempts to contact R.C.'s phone after she was reported missing.

that the green truck was seized and searched by police officers, who testified that there was drywall mud throughout the bed and brown roofing screws in the vehicle.

An autopsy was conducted on R.C.'s body. At trial, a forensic pathologist testified consistent with the autopsy report, opining that R.C.'s death was the result of homicide. He further opined that R.C.'s body had likely been exposed for several days before it was discovered, due to the level of decomposition and animal predation. He could not rule out smothering—the State's theory as to R.C.'s cause of death—because of missing soft tissue on R.C.'s body.

Petitioner was originally indicted on two charges: murder and concealment of a deceased body. Thereafter, the State obtained a superseding indictment that included both the original offenses and added death of a child by custodian by child abuse. At trial, the State presented testimony from thirty-eight witnesses over the course of approximately two weeks, at the conclusion of which petitioner was convicted of each of the charges contained in the superseding indictment.[6] Following his May 23, 2023, resentencing for purposes of appeal, he now seeks appellate review.

---

[6] Petitioner does not appeal his conviction for concealment of a deceased body pursuant to West Virginia Code § 61-2-5a.

9

## II. STANDARD OF REVIEW

Petitioner's assignments of error are subject to particular standards of review, which will be set forth in our discussion of each issue raised on appeal. Nevertheless, our overarching standard is as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance,* 207 W. Va. 640, 535 S.E.2d 484 (2000). With these standards in mind, we proceed to the parties' arguments.

## III. DISCUSSION

Petitioner asserts three assignments of error. We first evaluate petitioner's assertion that the circuit court abused its discretion in denying petitioner's motion for a change of venue. We then address an evidentiary issue: whether the court abused its discretion in admitting expert testimony from a professional dog handler. Finally, we discuss petitioner's sufficiency of the evidence arguments.

### A. *Change of Venue*

Petitioner filed a pretrial motion for a change of venue, arguing that the amount of pretrial publicity about the case led inexorably to impermissible prejudice

against him. In support of this argument, petitioner presented a media study which he contends depicted significant media attention to R.C.'s disappearance and death. He also presented a public opinion survey, which he suggested showed considerable public knowledge of the case, and a determination by 45% of those surveyed that the person charged with R.C.'s murder was guilty. The circuit court conducted multiple hearings on the motion and held its ruling in abeyance pending jury selection, but ultimately denied the motion.

On appeal, petitioner argues that the court erred in denying relief because the pretrial publicity was so rampant that petitioner was stripped of the presumption of innocence and denied his right to a fair trial. He alleges that the pretrial publicity created a present hostile sentiment against him in Morgan County, citing to a media study which detailed the widespread media attention this matter received. In response, the State maintains that evidence of widespread publicity was an insufficient foundation for a change of venue; further, the State attacks the utility and reliability of petitioner's media study.

We recently observed:

West Virginia Code § 62-3-13 (1923) provides, in pertinent part, that "[a] court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county." *See* W. Va. Const. art. III, § 14 ("Trials of crimes, and of misdemeanors, unless herein otherwise provided, shall be . . . in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is

removed to some other county."). Rule 21(a) of the West Virginia Rules of Criminal Procedure provides:

> The circuit court upon motion of the defendant shall transfer the proceedings as to that defendant to another county if the circuit court is satisfied that *there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial* at the place fixed by law for holding the trial.

*Sowards v. Ames*, 248 W. Va. 213, 226, 888 S.E.2d 23, 36 (2023) (emphasis added).

> To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused. Point 2, Syllabus, *State v. Wooldridge,* 129 W.Va. 448, 40 S.E.2d 899 (1946). Syllabus Point 1, *State v. Sette,* 161 W.Va. 384, 242 S.E.2d 464 (1978).

Syl. Pt. 1, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). We have previously held that

> "'[a] present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927).' Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978)."

*Derr*, 192 W. Va. at 167, 451 S.E.2d at 733, Syl. Pt 2. "Good cause" for a change of venue "means proof that a defendant cannot get a fair trial in the county where the offense occurred because of the existence of a locally extensive present hostile sentiment against

12

him." Syl. Pt. 1, in part, *State v. Pratt,* 161 W. Va. 530, 244 S.E.2d 227 (1978). *See also* Syl. Pt. 2, *State v. Zaccagnini*, 172 W. Va. 491, 308 S.E.2d 131 (1983). However, we have consistently held that "[w]idespread publicity, of itself, does not require [a] change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer,* 169 W. Va. 177, 286 S.E.2d 389 (1982); *see also* Syl. Pt. 2, *State v. Young,* 173 W. Va. 1, 311 S.E.2d 118 (1983).

Appreciating that there had been widespread publicity concerning the case, the circuit court thoughtfully considered petitioner's motion for change of venue, conducting three extensive hearings on the issue and taking the motion under advisement pending the outcome of jury selection. The court, noting that jury selection was the best method to determine whether an unbiased jury could be seated, took additional safeguards by increasing the number of potential jury members and allowing extensive voir dire of the prospective jury pool.[7] Additionally, the transcripts of jury selection reveal that the court readily dismissed jurors for cause where there was any question as to their partiality, which

---

[7] Due to issues presented by the COVID-19 crisis, the court actually conducted jury selection on two occasions with different jury panels and was able to empanel two juries, a factor that further supports the circuit court's ruling. Although the fact that a jury could be empaneled is not conclusive, it is certainly a factor to consider when faced with a motion for a change of venue. *See* Syl., *State v. Flaherty,* 42 W. Va. 240, 24 S.E.2d 885 (1896). ("The fact that a jury free from exception can be impaneled is not conclusive, on a motion for change of venue, that prejudice does not exist, endangering a fair trial, and will not justify the court in refusing to receive other evidence to support such motion.").

resulted in the court excusing twenty-nine jurors. Ultimately, the court empaneled, without objection, an impartial twelve-person jury with four alternates.

In view of the foregoing, we find that petitioner failed to meet his burden to establish good cause for a change of venue. *See Derr*, 192 W. Va. at 167, 451 S.E.2d at 733, Syl. Pt. 1. Simply put, despite being provided ample opportunity to demonstrate the existence of facts that would warrant a change of venue, including authorization for a media study and a public opinion survey, petitioner failed to carry his burden of establishing that a hostile sentiment or prejudice against him permeated throughout the county to a level that prevented him from receiving a fair and impartial trial. *See Sowards*, 248 W. Va. at 226, 888 S.E.2d at 36. Thus, we conclude that the court did not abuse its discretion in denying petitioner's motion for a change of venue.

B. *Testimony and Evidence from Cadaver Dog Search*

Prior to trial petitioner moved the circuit court to exclude the testimony of the State's expert witness, Ms. Eggeman, a certified human remains detection dog handler. Petitioner argues that this evidence failed to meet the reliability threshold set forth in Rule 702 of the West Virginia Rules of Evidence and did not withstand analysis pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Petitioner questions the reliability of the evidence from the cadaver dog search, the "testability of the underlying science behind the 'scent theory'" utilized by cadaver dogs, and further argues that the evidence of the cadaver dog search should be excluded pursuant to Rule 403 of the West

Virginia Rules of Evidence.[8] We observe that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis,* 204 W. Va. 58, 511 S.E.2d 469 (1998).

Rule 702(a) of the West Virginia Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The United States Supreme Court directed in *Daubert* that

> Rule 702—place[s] appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to "scientific . . . knowledge," since the adjective "scientific" implies a grounding in science's methods and procedures, while the word "knowledge" connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds. The Rule's requirement that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility.
>
> Faced with a proffer of expert scientific testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a

---

[8] Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue. Many considerations will bear on the inquiry, including whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate. Throughout, the judge should also be mindful of other applicable Rules.

*Daubert*, 509 U.S. at 579-80. In *Wilt v. Buraker*, 191 W. Va. 39, 46, 443 S.E.2d 196, 203

(1993) we concluded

That *Daubert's* analysis of Federal Rule 702 should be followed in analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence. The trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

We have further held that

[t]he first and universal requirement for the admissibility of scientific evidence is that the evidence must be both 'reliable' and 'relevant.' Under *Daubert/Wilt*, the reliability requirement is met only by a finding by the trial court under Rule 104(a) that the *scientific* or technical theory which is the basis for the test results is indeed 'scientific,

16

technical, or specialized knowledge.' The trial court's determination regarding whether the scientific evidence is properly the subject of 'scientific, technical, or other specialized knowledge' is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' W.Va.R.Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement are reviewed under an abuse of discretion standard.

Syl. Pt. 3, *Gentry v. Mangum,* 195 W. Va. 512, 466 S.E.2d 171 (1995).

As a threshold matter, we note that this Court has previously upheld the admissibility of expert testimony pertaining to a trained dog's reaction to evidence. *See* Syl. Pt. 1, *State v. McKinney*, 88 W. Va. 400, 106 S.E. 894 (1921) ("Evidence of the trailing of a person accused of the commission of an offense, from the place of the perpetration thereof to the place of his arrest, by bloodhounds shown to be of pure blood, to have acuteness of scent and power of discrimination between persons by means thereof, to have been trained in the trailing of human beings, and to have successfully trailed and identified other persons accused of crime as having been at the scene of commission thereof, is admissible on an issue as to his identity as a person who had been at the place of the perpetration of the offense of which he is accused at or near the time thereof."); *State v. Broughton*, 196 W. Va. 281, 287, 470 S.E.2d 413, 419 (1996) (determining that circuit court did not abuse its discretion in admitting cash as authentic and relevant evidence where the State established that the money was located by a trained, experienced police dog thirty-five to forty feet from the point of the defendant's apprehension). Similarly, a majority of

17

jurisdictions that have considered this issue have determined that this type of evidence is admissible as long as there is a proper foundation for the evidence. *See* Jay M. Zitter*, Evidence of Trailing by Dogs in Criminal Cases*, 81 A.L.R.5th 563 (2000); *Litigation of Admissibility of Cadaver Dog Evidence*, 150 Am. Jur. *Trials* §587 (2017).[9]

Here, the circuit court conducted an evidentiary hearing in which Ms. Eggeman discussed her extensive background, qualifications and training with canine handling, behavior, and detection of human decomposition. She testified that she has been a handler of search and rescue K-9s for twenty-two years, with six different operational dogs that had met or exceeded state and other standards. Further, she testified that the K-9

---

[9] *See State v. White*, 676 S.E.2d 684 (S.C. 2009) (finding that a sufficient foundation for the admission of dog tracking evidence is established if (1) the evidence shows the dog handler satisfies the qualifications of an expert witness, (2) the evidence shows the dog is of a breed characterized by an acute power of scent, (3) the dog has been trained to follow a trail by scent, (4) by experience the dog is found to be reliable, (5) the dog was placed on the trail where the suspect was known to have been within a reasonable time, and (6) the trail was not otherwise contaminated; *People v. Lane*, 862 N.W.2d 446 (Mich. Ct. App. 2014) (affirming a murder conviction, rejecting claim that the trial court erred when it admitted cadaver dog evidence, and explaining that tracking dog evidence is sufficiently reliable if the proponent of the evidence establishes: (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it); *Torrez v. State,* 294 So.3d 390 (Fla. Dist. Ct. App. 2020) (finding that expert testimony concerning a dog's human decomposition detection is admissible after a proper foundation for reliability is laid to show that: (1) the handler was qualified to work with the dog and to interpret its responses; (2) the dog was sufficiently trained and accurate in the detection of human decomposition odor; (3) circumstantial evidence corroborates the dog's scent identification; and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it).

who assisted with the investigation, Rock, was a nine-year-old German Shepherd who was first certified in the detection of human remains in 2015. She discussed the extensive training and testing that dogs must complete to receive a human remains detection certification and further testified that the dogs are tested with distractions including food, other dead animals or carcasses, and must not show any interest in these other items. Ms. Eggeman testified that cadaver dog certification requires the dog to be able to identify the presence of human remains at all stages of decomposition, noting that a dog will fail if they fail to detect at any stage of decomposition.

Following the guidance of Rule 702 of the West Virginia Rules of Evidence and our law as enunciated in *Gentry*, we conclude that the State adequately established that Ms. Eggeman was qualified as an expert to testify as to her work with the dog. Ms. Eggeman had extensive expertise with the German Shepard, the dog was sufficiently trained and certified in the detection of human decomposition, and the evidence was not so stale so as to make it beyond the dog's competency to identify. Moreover, the State presented circumstantial evidence corroborating the dog's scent identification, thus further justifying its introduction as evidence at trial, including: the presence of what appeared to be drywall mud on R.C.'s body and in the bed of the green truck; the presence of unique roofing screws that were found in petitioner's tool belt, on a job that petitioner was working, in the green truck bed, and near where the body was discovered; and the testimony from a witness that she saw an individual matching petitioner's description, driving a truck matching the description of the green truck driven by petitioner, in the area where R.C.'s

19

body was discovered. We therefore conclude that the circuit court did not abuse its discretion in admitting the testimony of Ms. Eggeman.

We are likewise not persuaded by petitioner's contention that the evidence should be precluded by Rule 403 of the West Virginia Rules of Evidence, i.e., that its probative value is substantially outweighed by its prejudicial effect. *See supra* note 8. We have held that "[a]s to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." *Derr*, 192 W. Va. at 168, 192 W. Va. at 734, Syl. Pt. 10, in part. There being no showing of a clear abuse by the trial court in admitting this evidence, we affirm the circuit court's ruling on this issue.

### C. Sufficiency of the Evidence

In his final assignment of error, petitioner argues that there was insufficient evidence to support his first-degree murder conviction, and that there was insufficient evidence of his relationship to R.C. to establish his conviction for death of a child by a custodian. A criminal defendant bears a heavy burden when raising a sufficiency of the evidence challenge:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save

20

that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). The weight the jury affords particular evidence is of no moment in a sufficiency challenge; rather, the question before this Court is whether there was *any* evidence upon which the jury could "find guilt beyond a reasonable doubt." *See State v. Zuccaro*, 239 W. Va. 128, 145, 799 S.E.2d 559, 576 (2017) (noting *Guthrie* requires a petitioner to "prove there is *no* evidence from which the jury could find guilt beyond a reasonable doubt.").

Petitioner advances a two-fold challenge to his first-degree murder conviction: there was insufficient evidence to support the murder conviction, or, alternatively, the State failed to meet its burden to prove petitioner was guilty of first-degree murder. He maintains that no rational jury could have concluded beyond a reasonable doubt that he perpetrated the crimes against R.C., given that there was no physical evidence—DNA, blood, hair, etc.—linking petitioner to R.C.'s death, and that the State did not establish when R.C. was murdered, or the manner in which her death occurred. Accordingly, petitioner contends his conviction cannot stand.

Regarding premeditation, it is well established that mental processes such as intent can be inferred from the evidence presented at trial. Further, while criminal cases require proof beyond a reasonable doubt, the law recognizes no distinction between direct

and circumstantial evidence. *State v. Guthrie*, 194 W. Va. 657, 669, 461 S.E.2d 163, 175 (1995). Premeditation is typically established through circumstantial evidence:

> [A]s a practical matter, premeditation generally can be proved only by circumstantial evidence. Because the defendant's mental processes are wholly subjective, it is seldom possible to prove them directly. If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

*State v. LaRock*, 196 W. Va. 294, 305, 470 S.E.2d 613, 624 (1996). Additionally,

> [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Guthrie*, 194 W. Va. at 657, 461 S.E.2d at 163, Syl. Pt. 5.

Based on petitioner's argument, our focus is on whether sufficient evidence was presented to the jury to establish that petitioner killed R.C. and that he premeditated that killing. Although petitioner argues the State failed to present direct, physical evidence in support of his conviction, there is substantial circumstantial evidence to support the verdict. *See Guthrie*, 194 W. Va. at 669, 461 S.E.2d at 175.

The State presented evidence that petitioner acted erratically both during the night and early morning hours of the day R.C. was last heard from, and on the following

22

day, including: (1) deleting his messages with R.C.; (2) feverishly reaching out to an acquaintance with whom he was not on good terms, asking for a place to stay "for a few hours"; (3) purchasing and using drugs; and (4) calling and advising a co-worker that he was ready for work considerably earlier than he normally awoke. The State likewise presented evidence to establish that petitioner's actions after leaving for work the following day were unusual and irregular, including: leaving his phone at home when he left for work; snorting cocaine; taking multiple contractor grade bags from his employer (which matched evidence recovered from the scene where R.C.'s body was discovered); leaving the worksite for an extended period of time and lying about his whereabouts; returning to his house after leaving work and parking the green truck in an unusual fashion between the home and the shed; and being in the green truck on May 8th in the area where R.C.'s body was later discovered. Additionally, the State presented substantial testimony and video evidence that petitioner lied to officers concerning his actions and whereabouts on the evening of May 7, 2019 and the following day. Moreover, the State presented evidence that R.C.'s death was the result of a homicide that occurred several days before her body was discovered. Reviewing this evidence in the light most favorable to the prosecution, and crediting all inferences and credibility assessments that the jury might have drawn in favor of the prosecution, we conclude that there was sufficient evidence to support the murder conviction.

We also find petitioner's argument that the State failed to meet its burden to prove petitioner guilty of first-degree murder unavailing. The State presented evidence that

R. C.'s blood and saliva mixture were present on her sheets, pillow, and a Victoria Secret ribbon obtained from her bedroom, and presented circumstantial evidence suggesting that R.C. had been smothered by petitioner in her bedroom. The State contended that the method of the homicide was smothering, which by its very nature is not instantaneous. The time and sustained effort required of the smotherer affords the jury a basis to determine premeditation. Contrary to petitioner's assertion, after reviewing the evidence in the light most favorable to the prosecution, we find that the State *did* establish sufficient evidence to support this first-degree murder conviction. *See Guthrie,* 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pts. 1 and 3.

Having found that petitioner has failed to meet his burden with respect to his evidentiary challenge to his first-degree murder conviction, we now turn to petitioner's argument that the State presented insufficient evidence to prove death of a child by a parent, guardian, or custodian by child abuse. He asserts that there was no evidence presented that he exerted care, custody or control of R.C., an argument belied by the record. West Virginia Code section 61-8D-2a(a) provides:

> If any parent, guardian or custodian maliciously and intentionally inflicts upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian is guilty of a felony.

Further, the West Virginia Legislature has determined:

24

"Custodian" means a person over the age of 14 years who has or shares actual physical possession or care and custody of a child on a full-time or temporary basis, regardless of whether such person has been granted custody of the child by any contract, agreement, or legal proceeding. "Custodian" shall also include, but not be limited to, the spouse of a parent, guardian or custodian, or a person cohabiting with a parent, guardian or custodian in the relationship of husband and wife, where such spouse or other person shares actual physical possession or care and custody of a child with the parent, guardian or custodian.

W. Va. Code § 61-8D-1(4).

At trial, the State presented evidence that petitioner had been cohabitating with R.C.'s mother since 2017, and that both petitioner and C.O. were signatories to the rental agreement—facts undisputed by petitioner. Moreover, R.C.'s brother testified that petitioner had been the responsible adult with him, his brother and his sister R.C. on the evening of R.C.'s disappearance. Based upon this evidence alone, the jury could reasonably find that the State proved beyond a reasonable doubt that petitioner was R.C.'s custodian. Petitioner's final sufficiency of the evidence argument is unavailing; accordingly we decline to disturb his conviction.

## IV. CONCLUSION

For the reasons set forth above, we affirm the May 23, 2022, order of the Circuit Court of Morgan County.

Affirmed.

25